## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | | |
|---|---|---|
| **NETAPP, INC.,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CASE NO.** |
| | § | |
| **JÓN THORGRÍMUR** | § | |
| **STEFÁNSSON,** | § | |
| | § | |
| *Defendant.* | § | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff NetApp, Inc ("NetApp") brings this action for injunctive relief[1] and damages against its former employee, Defendant Jón Thorgrímur Stefánsson ("Stefánsson"), and alleges:

## INTRODUCTION

1.    This case involves a senior executive who—for months while he was still employed—actively worked against the company that employed him, secretly starting a conflicting business and developing a competing product that he eventually sold to a direct rival company. Using his insider access to company resources, trade secrets, confidential information, and proprietary technology, this senior executive advanced the interests—not of his employer—but of his own illicit start-up and of a direct competitor. And he did all of this on his current employer's dime.

---

[1] NetApp is filing a Motion for Temporary Restraining Order and Motion for Expedited Discovery alongside this Complaint for Injunctive Relief and Damages.

2.      Not only was this a flagrant breach of the company's trust, but it also violated this senior executive's contractual obligations to the company, including his duty of loyalty and the strict prohibitions against the use or disclosure of the company's protected information. But that's not all. Intertwined with these serious breaches is a mocking reference to a 1990s cult classic—an inside joke shared among the senior executive and a group of former employees used to taunt the company on their way out the door. The senior executive did not respond or deny his obligations and allegations when the company contacted him to give him an opportunity to explain himself.  Instead, he appears to have suddenly left the country to avoid accountability and, in any event, has refused to respond.

3.      The company, NetApp (or "the Company"), now brings this action for injunctive relief and damages to stop this former senior executive, Jón Thorgrímur Stefánsson, from further exploiting NetApp's confidential and proprietary information, from using designs, technology, ideas, inventions, and intellectual property that rightfully belong to NetApp on behalf of his own company or a direct competitor, and from further interfering with NetApp's most critical business relationships.

4.      NetApp is a leading provider of high-performance data management and cloud[2] services, helping businesses securely manage, access, and analyze their

---

[2] A cloud generally consists of a global network of remote servers that store and process data over the internet, allowing users to access data and services from any internet-connected device instead of their own computer's hard drive. Microsoft, *What is the Cloud?*, MICROSOFT AZURE, https://azure.microsoft.com/en-us/resources/cloud-computing-dictionary/what-is-the-cloud#:~:text=What%20is%20the%20cloud%20in,associated%20with%20maintaining%20phy

data across hybrid and multi-cloud environments with speed and efficiency. Stefánsson was a longtime NetApp employee who held various executive roles with the Company, including Vice President of Cloud Services, Chief Technology Officer and Vice President of Cloud Services, and finally Chief Technology Officer and Senior Vice President. Over his eight-year tenure with the Company, his responsibilities included overseeing the Company's first-party cloud storage products and developments, leading the Company's cloud strategy, public cloud partnerships, alliances, and solutions for NetApp's entire cloud portfolio. In January 2023, he permanently transferred and relocated to Florida, living and working for NetApp in Orlando. These different roles gave Stefánsson wide-ranging access to NetApp's most confidential information, proprietary innovations, intellectual property, and business relationships, including exclusive insight into NetApp's relationships and agreements with its hyperscaler[3] business partners.

5.    NetApp requires all employees accessing such information to execute a Proprietary Information, Inventions, and Non-Solicitation Agreement ("PIIA" or the "Agreement") before beginning work for the Company. And Stefánsson was no exception. He signed a PIIA before beginning work for the Company, and the

---

sical%20infrastructure  (last visited Oct. 29, 2025).

[3] A hyperscaler is a large, cloud-based provider—such as Amazon Web Services ("AWS"), Google Cloud, or Microsoft Azure—that offers enterprises on-demand, highly-scalable computing infrastructure and networking services. Red Hat, *What Is a Hyperscaler?*, RED HAT, https://www.redhat.com/en/topics/cloud-computing/what-is-a-hyperscaler (last visited Oct. 29, 2025).

Agreement prohibited him from disclosing or improperly using any of NetApp's confidential and proprietary information, during or after his employment. The Agreement further required Stefánsson to assign NetApp all his Inventions[4] during his employment. Accordingly, any Inventions Stefánsson developed while still employed by NetApp belonged to NetApp under the PIIA. In addition to assigning NetApp the rights to any Inventions created during Stefánsson's employment, the PIIA required Stefánsson to notify NetApp of any Inventions in the six months following his employment. What's more, the PIIA barred Stefánsson from soliciting NetApp's Business Partners and employees or in any way interfering with NetApp's agreements with them.

6.      But that didn't stop Stefánsson. After years with NetApp—during which time NetApp provided Stefánsson with numerous pay increases in exchange for his employment—Stefánsson began secretly starting a conflicting startup called Red Stapler (a nod to the 1990s cult film *Office Space*). His apparent mission with the startup was to develop a competing cloud control plane and service delivery platform, which NetApp—in part through Stefánsson—had already created as NetApp's Service Delivery Engine ("SDE"). The SDE acts as an orchestrator

---

[4] Capitalized terms not otherwise defined in this Complaint have the meaning assigned to them in the PIIA, attached as Exhibit A to this Complaint. The PIIA defines "Inventions" as "any: (i) discoveries, designs, developments, technology, formulas, processes, techniques and inventions (whether or not protectable under patent laws); (ii) works of authorship, software programs or subroutines, source or object code and information fixed in any tangible medium of expression (whether or not protectable under copyright laws); (iii) trade secrets, know-how and ideas (whether or not protectable under trade secret laws); (iv) trademarks, service marks, trade names and trade dress (whether or not protectable under trademark laws); and (v) any improvements, modifications, derivative works, enhancements to any of the foregoing." PIIA § 6.

between the hyperscaler and NetApp storage, allowing end users to manage and operate all elements of the data estate, including storage capacity, movement, protection, and analysis of an organization's ever-expanding and increasingly dispersed data, from the hyperscaler's native interface. And the SDE can integrate with any public cloud platform.

7.    While Stefánsson did not formally separate from NetApp until June 27, 2025, he began working on Red Stapler and planning his departure long before that. In January 2025, an ex-NetApp employee—who now sits on the board of NetApp's competitor and Stefánsson's current employer, VAST Data ("VAST")— sent a text message to another ex-NetApp employee, saying: "Jonsi is in." Shortly thereafter, this same ex-NetApp employee sent another text containing a single, glaring image: a red stapler. Roughly two months later, on April 22, 2025, Stefánsson asked NetApp's then-Chief Technology Officer of Cloud Business Unit, Eiríkur Sveinn Hrafnsson ("Hrafnsson"), in the Company-provided Slack chat application, "Did you have the salary figures for everyone we want to get [to go to Red Stapler?]"[5] Both of them were employees at the time. What's more, NetApp discovered a Red Stapler Github repository just days ago that indicates Stefánsson and Hrafnsson must have been designing and developing software for Red Stapler while Stefánsson was still at NetApp, thereby violating multiple provisions in the PIIA.

---

[5] This Slack chat exchange between Stefánsson and Hrafnsson is attached to this Complaint as Exhibit B, along with a certified translation of the exchange from Icelandic to English.

8.     Red Stapler officially incorporated on July 3, 2025, with Stefánsson at the helm as its leader or CEO, along with five former NetApp employees and one then-current NetApp employee, Hrafnsson. It operated in stealth for two months. Then, on September 9—just ten weeks after Red Stapler's incorporation—a direct competitor of NetApp, VAST, acquired the nascent start-up for an undisclosed sum. The press release for the acquisition flaunted Stefánsson's past experience "compet[ing] against VAST" (while at NetApp) and the Red Stapler team's "track record of designing and launching cloud-native services with leading hyperscalers."[6] But the real prize was Red Stapler's "cloud control plane and service delivery platform," which would allow VAST to "burst seamlessly into public cloud environments."[7]

9.     Of course, these are the products that Stefánsson and his team had worked on prior to leaving NetApp. NetApp had spent *years* and *tens of millions* of dollars developing its SDE and tailoring the SDE that fit the requirements of the major hyperscalers, going through numerous cycles of trial-and-error to perfect it. Stefánsson took advantage of these investments. By leveraging NetApp's confidential and proprietary information, Stefánsson and the Red Stapler team (five former and one then-current NetApp employee, Hrafnsson) allegedly "developed" competing products in just ten weeks. The then-current employee,

---

[6] VAST Data, Press Release, *VAST Data Accelerates Hyperscale Cloud Expansion, Appoints Jonsi Stefansson* (Oct. 29, 2025), https://www.vastdata.com/press-releases/vast-data-accelerates-hyperscale-cloud-expansion-appoints-jonsi-stefansson [hereinafter "VAST Press Release"].

[7] *Id.*

Hrafnsson, who is the second biggest Red Stapler shareholder, remained an employee of NetApp until August 31, 2025.

10.     Less than two weeks after learning of the acquisition and the nature of Red Stapler's alleged developments, NetApp sent Stefánsson the first of two cease-and-desist letters. NetApp's letter emphasized the direct overlap between Stefánsson's role at NetApp and his new role as VAST's General Manager of Cloud Solutions. The letter further referenced the impossibility of Red Stapler developing its cloud control plane and service delivery platform—which VAST claimed to have acquired—without trading on NetApp's confidential and proprietary information.[8]

11.     Stefánsson did not respond to the letter. So, NetApp sent a second letter following up. He did not respond to that, either. That is because, as NetApp only just discovered on October 20, 2025, Stefánsson put his house in Orlando, Florida on the market *days after he received the first letter*. He then apparently left the county suddenly and moved to Iceland.

12.     While NetApp has given Stefánsson every opportunity to respond or comply with his obligations under the PIIA and not disclose NetApp's confidential and proprietary information, Stefánsson has refused to comply. And NetApp can no longer wait in good faith for a response because this past week the Company

---

[8] Even if Stefánsson and Red Stapler had developed such a product in that impossibly short time, the PIIA required Stefánsson to provide notice to NetApp of the Invention, which encompasses "discoveries, designs, developments, technology . . . (whether or not protectable under patent laws)," "works of authorship, software programs or subroutines, source or object code . . . (whether or not protectable under copyright laws)," as well as "know-how and ideas (whether or not protectable under trade secret laws)." PIIA §§ 6, C.2. But Stefánsson never provided NetApp with any such notice.

discovered from internal emails that an organization called "redstapler-is" existed on GitHub—a cloud-based source code repository that allows users to develop and collaborate on code, content, and research—at least as early as June 16, 2025, while Stefánsson was still an employee.[9]

13.    These communications show, among other things, that Stefánsson (either individually or in coordination with others) was developing technology and/or source code and innovating on behalf of another entity while still gainfully employed by NetApp. But Stefánsson, through the PIIA, assigned to NetApp all intellectual property rights to any idea, design, code or other Invention that he solely or jointly created, or developed during his employment. That idea, design, and source code therefore belongs to NetApp. Stefansson did not have the title or right to sell that intellectual property to a third party. And if Stefánsson leverages that intellectual property—or any part of NetApp's confidential and proprietary information relating to its public hyperscaler partnerships—then NetApp will face irreparable harm that damages will not remedy.

14.    For this reason, NetApp now moves for injunctive relief and damages for Stefánsson's breach of the PIIA and applicable federal and state laws.

---

[9] A GitHub "organization" is a shared account for a group of users to collaborate on projects, manage memberships, and control access to coding repositories. GitHub, *About Organizations*, GitHub Docs, https://docs.github.com/en/organizations/collaborating-with-groups-in-organizations/about-organizations (last accessed Oct. 29, 2025).

## PARTIES, JURISDICTION, AND VENUE

15.    NetApp, Inc., is a Delaware corporation with its principal place of business in San Jose, California. NetApp operates two offices in Florida: one in Tampa and one in Lake Mary.

16.    Defendant Jón Thorgrímur Stefánsson was a NetApp employee based in Florida. Stefánsson moved to Florida in approximately January 2023. He conducted NetApp business and committed his acts of breach in Florida.

17.    In addition, Stefánsson currently operates and maintains two businesses that are registered in Florida: Krummi, LLC and RoofAssure, Inc. Stefánsson reinstated RoofAssure in Florida on October 29, 2025.

18.    He is also an individual who appears to have recently moved out of his house in Orlando, Florida. He now, on information and belief, resides in Reykjavík, Iceland. He can be served through at least The Hague Convention on Service Abroad of Judicial or Extrajudicial Documents.

19.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. And this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims in this action because they are so related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy.

20.    This Court has personal jurisdiction over Stefánsson pursuant to Sections 48.193(1)(a)(1), (2), (7), and 48.193(1)(a)(2), Florida Statutes, because (1)

Stefánsson operated, conducted, engaged in, or carried on a business or business venture in Florida, including having an office or agency in Florida; (2) Stefánsson breached his contract with NetApp in Florida by failing to perform acts required by the contract to be performed in the state; (3) Stefánsson committed tortious acts within Florida by misappropriating NetApp's trade secrets in violation of the Defend Trade Secrets Act and Florida Uniform Trade Secrets Act; and (4) Stefánsson remains engaged in substantial and not isolated activity within this state by, among other things, having received and continuing to receive substantial economic benefits from continuing activity in Florida by owning two Florida based companies, Krummi LLC and RoofAssure, Inc.

21.    Venue is proper in this District as to Stefánsson pursuant to 28 U.S. Code § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred while Stefánsson resided in Orlando, Florida.

## FACTUAL BACKGROUND

**A.    NetApp's Strategic Investments Advance its Position as a Global Leader in Data Management in the Cloud and On-Premises.**

22.    NetApp is a global leader in cloud and on-premises data management products, empowering businesses to store, manage, protect, and seamlessly access their data across on-premises, private, and public cloud environments. NetApp's advanced technologies support virtually any cloud environment, allowing organizations of all sizes to access and mobilize their data regardless of where it resides. The Company is also the first vendor to offer first-party, cloud-native storage services directly integrated with the major hyperscalers, including Google Cloud, AWS, and Microsoft Azure. For example, this unique first-party offering allows end users to use NetApp's powerful data management capabilities natively within their preferred cloud platforms, with NetApp running as the underlying technology. In addition, for example, an end user using Google Cloud's Vertex AI[10] can access data stored in NetApp's system to train and deploy models without leaving the Google Cloud platform. This integration streamlines workflows and eliminates time-consuming data transfers.[11]

23.    NetApp invested years of engineering effort and substantial resources to support these innovations, and it worked closely with its hyperscaler Business

---

[10] Google Cloud, *Vertex AI*, GOOGLE CLOUD, https://cloud.google.com/vertex-ai (last visited Oct. 29, 2025).

[11] *See* Stefánsson, Jonsi, *Unlocking AI potential: The essential role of hybrid multicloud strategies*, NetApp.com (Nov. 19, 2024), https://www.netapp.com/blog/hybrid-multicloud-strategies-ai/.

Partners to develop solutions that worked for their unique business needs. This investment of time and resources was aimed at addressing one of the most complex challenges in modern IT: managing the ever-growing volumes of data dispersed across multiple locations, both on-premises and in the cloud. Through NetApp's SDE, end users can access NetApp's storage functionality—which allows for, among other things, provisioning, managing, and protecting storage—directly within the familiar native interfaces that the hyperscalers already use. This unified approach simplifies operations, increases productivity, and eliminates the previously existing inefficiencies associated with managing and developing different service delivery engines on different platforms.

24.    Stefánsson, acting as NetApp's former Senior Vice President and Chief Technical Officer, and in other roles, played a central part in the development of the Company's advanced service delivery engines for cloud data management technologies, including its cloud control plane. Stefánsson was directly involved in the development and integration of NetApp's first-party, cloud-native storage products with the major hyperscalers.

**B.    Stefánsson—Greenqloud's CEO—Joined NetApp in Connection with the Acquisition.**

25.    Stefánsson first joined NetApp in 2017 as part of NetApp's acquisition of the Reykjavik, Iceland-based company, Greenqloud for $51M. Greenqloud had successfully developed a cloud services orchestration and management platform for hybrid-cloud and multi-cloud environments, and Stefánsson was the

company's CEO. So, Stefánsson came over to help integrate Greenqloud's Service Delivery Platform technology into NetApp's data storage and management products. He was joined by Greenqloud's co-founder and Chief Technology Officer, Hrafnsson. A number of other former Greenqlouders came along with Stefánsson and Hrafnsson, including: Tryggvi Larusson, Þórhallur Helgason ("T. Helgason"), and Grímur Jónsson.

26.    Stefánsson led NetApp's first-party cloud storage business, including product management and engineering. He later served as Chief Technology Officer for the Cloud Business Unit, managing its portfolio and shaping strategic objectives, before assuming his final position as Senior Vice President and Chief Technology Officer overseeing cloud partnerships, strategy, and alliances in field sales. Together, these roles gave Stefánsson broad access to NetApp's most sensitive confidential and proprietary information, including product roadmaps, cloud service architectures, partner strategies, go-to-market materials, and the operational details of NetApp's hyperscaler relationships. Not only did Stefánsson have access to the terms of these hyperscaler relationships, but he also had access to confidential information that the hyperscalers shared to enable NetApp to develop its tailor-made products.

## C.    Stefánsson Signed a Proprietary Information, Inventions, and Non-Solicitation Agreement as a Condition of His Employment.

27.    NetApp deploys a number of security measures across the Company to protect its trade secrets, confidential information, and proprietary information,

including password protection, single sign-on, multi-factor authentication, encryption, tiered access, conditional access, and confidentiality stamping. In addition to deploying these technical protocols, NetApp conducts access audits, requires annual cybersecurity trainings of all its employees, maintains data-use policies, employs a review board that approves who gets access to restricted information, dictates how employees can access that information, and requires those employees to enter contractual agreements to protect that information.

28.    Since Stefánsson would have access to NetApp's most sensitive confidential and proprietary information in his new role at the Company, NetApp required Stefánsson to contractually agree to protect that information, prior to the beginning of his employment. NetApp specifically had him sign the PIIA.

29.    The PIIA detailed a series of covenants and obligations that Stefánsson agreed to in exchange for his employment and the compensation he would receive from the Company. It specifically provides:

   (a) **Ownership and Nondisclosure of Proprietary Information.** "All Proprietary Information and related intellectual property rights are the property of the Company," and may not be "use[d] or disclose[d] without advance written consent." (PIIA § B);

   (b) **Company Inventions.** Stefánsson must "promptly disclose in writing . . . all Inventions conceived, reduced to practice, created, derived, developed, or made by [him] during the term of [his] employment with the Company." Stefánsson "assign[ed] and agreed to assign to the Company . . . any and all right, title and interest" in the Inventions, "which assignment operates automatically upon the conception of the Company Inventions." (PIIA § C.1);

   (c) **Future Inventions.** Stefánsson must "disclose promptly in writing . . . all Inventions conceived, reduced to practice, created, derived,

developed, or made by [him] for six (6) months" following the term of his employment. (PIIA § C.2);

(d) **Non-Solicitation of Covered Customers or Business Partners.** "[F]or a period of one year" following separation, Stefánsson will not "directly or indirectly . . . solicit or induce any current or prospective customer, partner, reseller, supplier, or other person having a contractual relationship with the Company (collectively, "Business Partner"), to terminate or otherwise alter such relationship to the Company's detriment, or in any other manner interfere with such relationship." (PIIA § G).

(e) **Non-Solicitation of Company Employees, Contractors or Consultants.** "[F]or a period of one year" following separation, Stefánsson "will not directly or indirectly . . . solicit or induce" a NetApp "employee, contractor or consultant" to "render services" for another entity or to terminate their engagement with NetApp. (PIIA § H).

## D.  Stefánsson Began Working on a Competing Venture While Still Employed at NetApp.

30.    While NetApp rewarded Stefánsson for his work with repeated increased compensation and made substantial resources available for development, Stefánsson was not satisfied. Stefánsson secretly started to work on his own conflicting venture, possibly as early as January 2025.

31.    Stefánsson called the new venture "Red Stapler," a tongue-in-cheek reference to the 1990s film *Office Space*, which details a disgruntled software engineer who becomes fed up with his corporate job and oppressive management, so he executes a plan to embezzle money from his company. The movie ends with another disgruntled employee burning the office down after his corporate tormentor steals his prized possession: a red stapler.

32.    On information and belief, Stefánsson started working on the conflicting venture beginning in January 2025, and possibly earlier. Indeed, that same month, an ex-NetApp employee—who now sits on the board for VAST—sent a text message to another ex-NetApp employee, saying, "Jonsi is in." Shortly thereafter, this same ex-NetApp employee sent another text containing a single image: a red stapler.

33.    Stefánsson and his allies continued their work following these messages, focusing on the development of a cloud control plane and service delivery platform—the products that NetApp had been building, marketing, and selling for years under Stefánsson. Stefánsson was also focused on building the team for his new competing venture and what he would have to shell out to get other employees to leave NetApp. Indeed, as NetApp discovered just days ago through review of the Company-provided Slack chat application, on April 22, 2025, Stefánsson and Hrafnsson discussed taking NetApp employees to Red Stapler. Stefánsson asked Hrafnsson, "[d]id you have the salary figures for everyone we want to get?" To which Hrafnsson responded "[y]es, or just me, Tryggvi, Gimmi, and Laddi, for now. How many should we aim to get onboard initially vs. hiring afterward?"[12] A review of the internal emails further revealed the existence of a source code repository named "redstapler.is" that had been active on GitHub as early as June 16, 2025 (while Stefánsson was still employed by NetApp). The

---

[12] Ex. B, Slack Thread (4/22/2025).

existence of this organization on GitHub indicates that Stefánsson, Hrafnsson, and others were almost certainly developing software, code, or other technology while still employed by NetApp—technology that was automatically assigned to NetApp upon conception as specified by the PIIA.  Stefánsson formally separated from NetApp on June 27, 2025.

**E.    Stefánsson Resigned and Immediately Incorporated his New Venture, Red Stapler.**

34.    In May 2025, NetApp and Hrafnsson agreed to a separation date scheduled for August 31, 2025. Roughly a month later, on June 17, 2025, Stefánsson submitted his resignation, as he could no longer continue to work on Red Stapler with Hrafnsson during work hours and on NetApp's dime. Stefánsson was openly critical of his employer and actively solicited and induced others to follow his lead while still employed by NetApp in Florida, resulting in multiple other NetApp employees submitting their own resignations to the Company.

35.    Stefánsson, for his part, said that he was returning to the start-up world. But he provided little information about what he would be doing or, more importantly, about what he had already done. He did not say he had conceived or began developing code, software, or similar technology (all of which would belong to NetApp under the PIIA) for use in a competing product; he did not say he had already poached several other NetApp employees; and he did not say that he had already communicated with NetApp's competitor (including one member of the

board in particular) about a potential acquisition, which on information and belief he did.

36.    Stefánsson formally separated from NetApp on June 27, 2025. Less than a week later, on July 3, 2025, Stefánsson incorporated Red Stapler. Stefánsson served as its leader and the Chairman of the Board. He possessed a 56% ownership stake in the company, and Hrafnsson possessed a 20% ownership stake. Other former Greenqloud employees who had joined NetApp as part of the acquisition—and followed Stefánsson after his resignation—made up the remaining 24% ownership in Red Stapler. That included, among others: Grímir Jónsson, Páll Helgason ("P. Helgason"), T. Helgason, and Tryggvi Larusson.

**F.    Red Stapler was Acquired by NetApp's Direct Competitor.**

37.    On September 9, 2025, VAST—NetApp's direct competitor—acquired Red Stapler for an undisclosed sum. The acquisition occurred less than ten weeks after Stefánsson had incorporated Red Stapler.

38.    The press release announcing VAST's acquisition focused on Red Stapler's supposed development of a cloud control plane and delivery platform. It flaunted the Red Stapler team's supposed experience, emphasizing the specific role that Stefánsson would play in helping VAST "[a]ccelerate Hyperscale Cloud Expansion," which was precisely what NetApp hired (and handsomely compensated) Stefánsson to do.[13] The release further highlighted that

---

[13] VAST Press Release, *supra* note 6.

"[t]he Red Stapler team brings a proven track record of designing and launching cloud-native services with leading hyperscalers."[14]

39.    Of course, the only relevant track record Stefánsson and the Red Stapler team possessed was the track record they had developed at NetApp and Greenqloud (which NetApp acquired). That includes years of direct involvement in NetApp's public cloud and AI strategy, during which time Stefánsson had access to NetApp's most sensitive innovations and confidential materials, as well as NetApp's hyperscaler Business Partners' confidential information.

## G.    NetApp Demanded Stefánsson Acknowledge and Comply with His Obligations Under the PIIA, and Stefanson Fled to Iceland, Instead of Responding.

40.    On September 23, 2025, just weeks after the VAST acquisition, NetApp sent Stefánsson a letter demanding that he immediately sequester and return NetApp's proprietary information, including his company laptop, and cease any use or disclosure of NetApp's trade secrets. The letter emphasized Stefánsson's access to the Company's most sensitive innovations, cloud and AI strategies, and key partner relationships. It explained the harm that would occur if Stefánsson were to disclose NetApp's confidential material.  And it emphasized the highly likely overlap between the competing product Stefánsson and Red Stapler had supposedly developed in roughly ten weeks' time, and the product that Stefánsson and his team were working on during their last few years at NetApp.

---

[14] *Id.*

41.    Stefánsson never responded to this letter. Instead, as NetApp just discovered, Stefánsson put his house in Florida on the market days after he received the first letter. We believe he may have left the country and moved to Iceland.

42.    Not knowing Stefánsson had left the country, NetApp attempted to send a second letter weeks later, giving Stefánsson one last opportunity to respond and comply with his contractual obligations under the PIIA. While awaiting his response, however, on October 23, 2025, NetApp discovered the internal GitHub emails, revealing an active Red Stapler organization on the platform prior to Stefánsson's departure. These messages show that Stefánsson (either directly or indirectly) was developing technology, code, or otherwise working on his own company, in competition with NetApp, while still gainfully employed by NetApp.

43.    Having just discovered these messages, NetApp now brings this Complaint for Injunctive Relief and Damages against Stefánsson, alleging breaches of the PIIA and applicable federal and state laws.

**CAUSES OF ACTION**

**COUNT I**
**[Breach of Agreement – Injunctive Relief]**

44.    NetApp realleges and incorporates by reference paragraphs 1 through 43 of this Complaint as if fully set forth herein.

45.    This is an action for injunctive relief against Stefánsson.

20

46.    The PIIA is a valid and binding contract between NetApp and Stefánsson.

47.    **Stefánsson's Obligations:** The PIIA imposed several obligations on Stefánsson in exchange for his employment and the substantial compensation he received in connection with the same, including:

(a) **Ownership and Nondisclosure of Proprietary Information, PIIA § B.** Maintain the confidentiality of NetApp's proprietary information and trade secrets, "both during [his] employment by the Company and after the termination of [his] employment" and refrain from using or disclosing such information following the termination of his employment without NetApp's written consent.

(b) **Disclosure and Assignment of Company Inventions, PIIA § C.1–C.2.**

(i) Disclose and assign all Inventions "conceived, reduced to practice, created, derived, developed, or made" during his employment with NetApp to the Company, which includes "discoveries, designs, developments, technology . . . (whether or not protectable under patent laws)," "works of authorship, software programs or subroutines source or object code . . . (whether or not protectable under copyright laws)," as well "know-how and ideas (whether or not protectable under trade secret laws)." PIIA §§ 6, C.1–2.

(ii) Disclose all Inventions "conceived, reduced to practice, created, derived, developed, or made" within the six months following the end of his employment with the Company, which includes "discoveries, designs, developments, technology . . . (whether or not protectable under patent laws)," "works of authorship, software programs or subroutines, source or object code . . . (whether or not protectable under copyright laws)," as well "know-how and ideas (whether or not protectable under trade secret laws)." PIIA §§ 6, C.1–2.

(c) **Duty of Loyalty, PIIA § F.** Fulfill his duty of loyalty to NetApp by, among other things, not providing consulting services to any other entity engaged in a Conflicting Business (without NetApp's consent)

or misusing NetApp's confidential and proprietary information while still employed by the Company.

(d) **Non-Solicitation of Covered Customers or Business Partners, PIIA § G.** Refrain for a period of one year after the end of his employment from soliciting or inducing any current or prospective NetApp customer, partner, or other entity having a contractual or business relationship with NetApp.

(e) **Non-Solicitation of Company Employees, Contractors or Consultants, PIIA § H.** "[F]or a period of one year" following separation, Stefánsson "will not directly or indirectly . . . solicit or induce" a NetApp "employee, contractor or consultant" to "render services" for another entity or to terminate their engagement with NetApp.

48. **Stefánsson's Breaches:** Despite these clear obligations under the PIIA and the substantial compensation Stefánsson received from NetApp during his employment, Stefánsson, on information and belief:

(a) Secretly started his own company, Red Stapler, developing a competing product against NetApp while on NetApp's payroll, in the months before his resignation, trading on NetApp's confidential and proprietary information and conspiring with Hrafnsson and others about the NetApp employees they could poach.

(b) Conceived, created, or developed product, software, source code, ideas, or other Inventions for his own company, Red Stapler, while still employed at NetApp, either individually or in coordination with Hrafnsson and other former NetApp employees, and took those Inventions—which belong to NetApp under the PIIA—with him to Red Stapler.

(c) Purported to transfer title of Red Stapler Inventions created or developed while Stefánsson was still employed by NetApp (and therefore NetApp's property under the PIIA) to a competing business without NetApp's permission or consent.

(d) Misappropriated NetApp's confidential and proprietary information, including core trade secrets, to develop Red Stapler's cloud control

plane and service delivery platform. He further ignored his legal obligations and failed to notify NetApp of any such Invention.

(e) Misappropriated, and continues to misappropriate, NetApp's confidential and proprietary information, including core trade secrets, in implementing VAST's strategy to "accelerate hyperscale cloud expansion"[15]—the same implementation he led in a previous position at NetApp.

49.    Stefansson violated and breached his legal obligations to NetApp while still employed at NetApp. Further, there is a real and immediate threat going forward that Stefánsson will continue to breach the PIIA by using NetApp's confidential and proprietary information—including core trade secrets and Inventions that rightfully belong to NetApp—in his new role at VAST. There is further a real and immediate threat that Stefánsson will leverage NetApp's confidential and proprietary information to solicit or—more concerningly—interfere with the Company's ongoing relationships with its hyperscaler Business Partners in violation of his legal obligations.

50.    Stefánsson's breaches have resulted and will continue to result in irreparable and continuing harm to NetApp, its business, its customer relationships, goodwill, and proprietary interests, for which NetApp has no adequate remedy at law.

51.    Stefánsson's multiple breaches of his PIIA have further resulted and will continue to result in other significant, long-term damage to NetApp and will provide a significant unfair and unlawful advantage to Stefánsson and VAST.

---

[15] VAST Press Release, *supra* note 6.

52.     Unless Stefánsson is enjoined by this Court from engaging in the wrongful conduct described in this Complaint, NetApp will suffer irreparable harm for which it lacks an adequate remedy at law.

53.     NetApp has been and is likely to continue to be substantially and irreparably injured in its business, customer relationships, goodwill, and other proprietary interests, and the threat of continued injury to its business, customer relationships, goodwill, and other proprietary interests outweighs any harm the issuance of an injunction may impose upon Stefánsson.

54.     For these reasons, the provisions of the PIIA that Stefánsson seeks to enforce are reasonably necessary to protect NetApp's legitimate business interests.

55.     NetApp has a substantial likelihood of success on the merits of its claims.

56.     The Court's entry of the requested injunction will serve the public interest by honoring the contract freely negotiated by the parties and by protecting the legitimate business interests of NetApp, which the PIIA was intended to protect in the first instance.

57.     NetApp therefore demands judgment against Stefánsson:

(a) Preliminarily and permanently enjoining Stefánsson, his officers, agents, servants, employees, attorneys, and all persons or entities in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from:

(i) Using any of NetApp's confidential and proprietary information, including any information Stefánsson relied upon in building the cloud control plane and service delivery platform that Red Stapler allegedly developed.

(ii) Using any Invention that Stefánsson "conceived, reduced to practice, created, derived, developed, or made" while at NetApp, including any "discoveries, designs, developments, technology . . . (whether or not protectable under patent laws)," "works of authorship, software programs or subroutines source or object code . . . (whether or not protectable under copyright laws)," as well as "know-how and ideas (whether or not protectable under trade secret laws)." PIIA §§ 6, C.1–2.

(iii) Soliciting or in any way interfering with any of NetApp's relationships with its current employees, customers, Business Partners including NetApp's hyperscaler partners, and contractors.

(b) Ordering Stefánsson to disclose any Inventions that he "conceived, reduced to practice, created, derived, developed, or made," including any "discoveries, designs, developments, technology . . . (whether or not protectable under patent laws)," "works of authorship, software programs or subroutines source or object code . . . (whether or not protectable under copyright laws)," as well as "know-how and ideas (whether or not protectable under trade secret laws)" developed in the six months following the end of his employment at NetApp. PIIA §§ 6, C.1–2.1–2.

(c) Ordering Stefánsson to return all NetApp's confidential and proprietary information and to assign NetApp all rights to Inventions developed while at NetApp, including any previously undisclosed Invention relating to Red Stapler's cloud control plane and service delivery platform.

(d) Ordering Stefánsson to assign ownership rights to all ideas and designs, and their derivatives, developed while employed by NetApp, including all intellectual property of Red Stapler.

## COUNT II
## [Breach of Agreements – Damages]

58.    NetApp realleges and incorporates by reference paragraphs 1 through 43 of this Complaint as if fully set forth herein.

59.    This is an action for damages against Stefánsson for breach of the PIIA.

60.    The PIIA is a valid and binding contract.

61.    On information and belief, Stefánsson breached the PIIA by, among other things, secretly started a Conflicting Business, Red Stapler, while still employed by NetApp; conceiving, creating, or otherwise developing software, source code, ideas or other Inventions for Red Stapler, individually or in coordination with other former NetApp employees, while still at NetApp; misappropriating NetApp's confidential and proprietary information—including core trade secrets and Inventions that belong to NetApp—to develop a cloud control plane and service delivery platform for Red Stapler; failing to inform NetApp of the Inventions at Red Stapler; and soliciting and otherwise interfering with NetApp's relationships with its hyperscaler Business Partners and former employees.

62.    NetApp has suffered damages as a direct and proximate result of these breaches of the PIIA.

63.    NetApp therefore demands judgment against Stefánsson for damages in an amount to be proven at trial, together with costs, and all other relief to which NetApp is entitled at law or in equity.

## COUNT III
### [**Defend Trade Secrets Act, 18 U.S.C. § 1836,** *et seq.* **– Damages**]

64.    NetApp realleges and incorporates by reference paragraphs 1 through 43 of this Complaint as if fully set forth herein.

65.    This is an action for damages against Stefánsson for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

66.    NetApp possesses trade secrets related to its data management technology, including its first-party cloud storage services, which NetApp developed to run natively on its hyperscaler Business Partners' platforms. NetApp possesses trade secrets related to its cloud control plane and SDE. Together, these technologies enable NetApp's platform to efficiently manage, provision, and deliver data management services across complex, multi-cloud environments.

67.    NetApp took reasonable steps to protect the secrecy of its trade secrets, including, but not limited to, restricting access to such information and requiring NetApp employees, such as Stefánsson, to sign PIIAs.

68.    NetApp's trade secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure.

69.     Stefánsson obtained the trade secrets pursuant to the PIIA and thus, he received the trade secrets under circumstances that gave rise to a duty to maintain the secrecy of the information or limit its use.  Further, Stefánsson knew or should have known of the impropriety of using any of the trade secrets while at Red Stapler.

70.     Stefánsson made unauthorized disclosure and use of NetApp's trade secrets through the development of a competing product at Red Stapler—a Conflicting Business he started and now sold to VAST, NetApp's direct competitor.

71.     The misuse and unauthorized disclosure of NetApp's trade secrets is ongoing. On information and belief, Stefánsson has and will continue to solicit NetApp's Business Partners and employees and interfere with NetApp's contractual relationship with these Business Partners by exploiting NetApp's trade secrets. This exploitation will allow NetApp's competitor to fast-track its development of a competing product and to unfairly undermine NetApp in future competition.

72.     NetApp has and will continue to suffer damages as a direct and proximate result of Stefánsson's misappropriation of the Company's trade secrets.

73.     Stefansson's misappropriation was deliberate, willful and malicious, entitling NetApp to an award of reasonable attorneys' fees.

74.     NetApp therefore demands judgment against Stefánsson for damages in an amount to be proven at trial, together with costs, attorneys' fees, and all other relief to which NetApp is entitled at law or in equity.

**COUNT IV**
**[Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*. – Injunctive Relief]**

75.     NetApp realleges and incorporates by reference paragraphs 1 through 43 of this Complaint as if fully set forth herein.

76.     This is an action for injunctive relief against Stefánsson for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

77.     NetApp possesses trade secrets related to its data management technology, including its first-party cloud storage services, which NetApp developed to run natively on its hyperscaler Business Partners' platforms. NetApp possesses trade secrets related to its cloud control plane and SDE. Together, these technologies enable NetApp's platform to efficiently manage, provision, and deliver data management services across complex, multi-cloud environments.

78.     NetApp took reasonable steps to protect the secrecy of its trade secrets, including, but not limited to, restricting access to such information and requiring NetApp employees, such as Stefánsson, to sign PIIAs.

79.     NetApp's trade secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure.

80.     Stefánsson obtained the trade secrets pursuant to the PIIA and thus, he received the trade secrets under circumstances which gave rise to a duty to

maintain the secrecy of the information or limit its use. Further, Stefánsson knew or should have known of the impropriety of using any of the trade secrets while at Red Stapler.

81.    Stefánsson made unauthorized disclosure and use of NetApp's trade secrets through the development of a competing product at Red Stapler—a Conflicting Business he started and now sold to VAST, NetApp's direct competitor.

82.    The misuse and unauthorized disclosure of NetApp's trade secrets is ongoing. On information and belief, Stefánsson has and will continue to solicit NetApp's Business Partners and employees and interfere with NetApp's contractual relationship with these Business Partners by exploiting NetApp's trade secrets. This exploitation will allow NetApp's competitor to fast-track its development of a competing product and to unfairly undermine NetApp in future competition.

83.    Stefánsson's misappropriations of NetApp's trade secrets have resulted and will continue to result in irreparable and continuing harm to NetApp, its business, its customer relationships, goodwill, and proprietary interests, for which NetApp has no adequate remedy at law.

84.    Stefánsson's misappropriations of NetApp's trade secrets have further resulted and will continue to result in other significant, long-term damage to NetApp and will provide a significant unfair and unlawful advantage to Stefánsson and VAST.

85.    Unless Stefánsson is enjoined by this Court from engaging in the wrongful conduct described in this Complaint, NetApp will suffer irreparable harm for which it lacks an adequate remedy at law.

86.    NetApp has been and is likely to continue to be substantially and irreparably injured in its business, customer relationships, goodwill, and other proprietary interests, and the threat of continued injury to its business, customer relationships, goodwill, and other proprietary interests outweighs any harm the issuance of an injunction may impose upon Stefánsson.

87.    NetApp has a substantial likelihood of success on the merits of its claims.

88.    The Court's entry of the requested injunction will serve the public interest by protecting NetApp's trade secrets and legitimate business interests.

89.    NetApp therefore demands judgment against Stefánsson:

(a) Preliminarily and permanently enjoining Stefánsson, his officers, agents, servants, employees, attorneys, and all persons or entities in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from:

(i) Using any of NetApp's confidential and proprietary information, including any information Stefánsson relied upon in building the cloud control plane and service delivery platform that Red Stapler allegedly developed.

(ii) Using any Invention that Stefánsson "conceived, reduced to practice, created, derived, developed, or made" while at NetApp, including any "discoveries, designs, developments, technology . . . (whether or not protectable under patent laws)," "works of authorship, software programs or subroutines source or object code . . . (whether or not protectable under copyright laws)," as well

as "know-how and ideas (whether or not protectable under trade secret laws)." PIIA §§ 6, C.1–2.

(iii)    Soliciting or in any way interfering with any of NetApp's relationships with its current employees, customers, Business Partners including NetApp's hyperscaler partners, and contractors.

(b) Ordering Stefánsson to disclose any Inventions that he "conceived, reduced to practice, created, derived, developed, or made," including any "discoveries, designs, developments, technology . . . (whether or not protectable under patent laws)," "works of authorship, software programs or subroutines source or object code . . . (whether or not protectable under copyright laws)," as well as "know-how and ideas (whether or not protectable under trade secret laws)" developed in the six months following the end of his employment at NetApp. PIIA §§ 6, C.1–2.1–2.

(c) Ordering Stefánsson to return all NetApp's confidential and proprietary information and to assign NetApp all rights to Inventions developed while at NetApp, including any previously undisclosed Invention relating to Red Stapler's cloud control plane and service delivery platform.

(d) Ordering Stefánsson to assign ownership rights to all ideas and designs, and their derivatives, developed while employed by NetApp, including all intellectual property of Red Stapler.

32

## COUNT V
## [Misappropriation of Trade Secrets - § 688.001, *et seq.*, Fla. Stat. –
## Damages]

90.    NetApp realleges and incorporates by reference paragraphs 1 through 43 of this Complaint as if fully set forth herein.

91.    This is an action for damages against Stefánsson for misappropriation of trade secrets under the Florida Uniform Trade Secrets Act, § 688.001, *et seq.*, Fla. Stat.

92.    NetApp possesses trade secrets related to its data management technology, including its first-party cloud storage services, which NetApp developed to run natively on its hyperscaler Business Partners' platforms. NetApp possesses trade secrets related to its cloud control plane and SDE. Together, these technologies enable NetApp's platform to efficiently manage, provision, and deliver services across complex, multi-cloud environments.

93.    NetApp took reasonable steps to protect the secrecy of its trade secrets, including, but not limited to, restricting access to such information and requiring NetApp employees, such as Stefánsson, to sign PIIAs.

94.    NetApp's trade secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure.

95.    Stefánsson obtained the trade secrets pursuant to the PIIA and thus, he received the trade secrets under circumstances which gave rise to a duty to maintain the secrecy of the information or limit its use.  Further, Stefánsson knew or should have known of the impropriety of using any of the trade secrets while at Red Stapler.

96.    Stefánsson made unauthorized disclosure and use of NetApp's trade secrets through the development of a competing product at Red Stapler and now at VAST, NetApp's direct competitor.

97.    The misuse and unauthorized disclosure of NetApp's trade secrets is ongoing. On information and belief, Stefánsson has and will continue to solicit NetApp's Business Partners and interfere with NetApp's contractual relationship with these Business Partners by exploiting NetApp's trade secrets. This exploitation will allow NetApp's competitor to fast-track its development of a competing product and to unfairly undermine NetApp in future competition. NetApp has and will continue to suffer damages as a direct and proximate result of Stefánsson's misappropriation of the Company's trade secrets.

98.    Stefansson's misappropriation was deliberate, willful, and malicious, entitling NetApp to an award of reasonable attorneys' fees.

99.    NetApp therefore demands judgment against Stefánsson for damages in an amount to be proven at trial, together with costs, attorneys' fees, and all other relief to which NetApp is entitled at law or in equity.

## COUNT VI
## [Misappropriation of Trade Secrets - § 688.001, *et seq.*, Fla. Stat. –
## Injunctive Relief]

100.    NetApp realleges and incorporates by reference paragraphs 1 through 43 of this Complaint as if fully set forth herein.

101.    This is an action for injunctive relief against Stefánsson for misappropriation of trade secrets under the Florida Uniform Trade Secrets Act, § 688.001, *et seq.*, Fla. Stat.

102.    NetApp possesses trade secrets related to its data management technology, including its first-party cloud storage services, which NetApp developed to run natively on its hyperscaler Business Partners' platforms. NetApp possesses trade secrets related to its cloud control plane and SDE. Together, these technologies enable NetApp's platform to efficiently manage, provision, and deliver services across complex, multi-cloud environments.

103.    NetApp took reasonable steps to protect the secrecy of its trade secrets, including, but not limited to, restricting access to such information and requiring NetApp employees, such as Stefánsson, to sign PIIAs.

104.    NetApp's trade secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from their disclosure.

105.    Stefánsson obtained the trade secrets pursuant to the PIIA and thus, he received the trade secrets under circumstances that gave rise to a duty to maintain the secrecy of the information or limit its use.  Further, Stefánsson knew or should have known of the impropriety of using any of the trade secrets while at Red Stapler.

106.    Stefánsson made unauthorized disclosure and use of NetApp's trade secrets through the development of a competing product at Red Stapler and now at VAST, NetApp's direct competitor.

107.    The misuse and unauthorized disclosure of NetApp's trade secrets is ongoing. On information and belief, Stefánsson has and will continue to solicit NetApp's Business Partners and interfere with NetApp's contractual relationship with these Business Partners by exploiting NetApp's trade secrets. This exploitation will allow NetApp's competitor to fast-track its development of a competing product and to unfairly undermine NetApp in future competition. NetApp has and will continue to suffer damages as a direct and proximate result of Stefánsson's misappropriation of the Company's trade secrets.

108.    Stefánsson's misappropriations of NetApp's trade secrets have resulted and will continue to result in irreparable and continuing harm to NetApp, its business, its customer relationships, goodwill, and proprietary interests, for which NetApp has no adequate remedy at law.

109.   Unless Stefánsson is enjoined by this Court from engaging in the wrongful conduct described in this Complaint, NetApp will suffer irreparable harm for which it lacks an adequate remedy at law.

110.   NetApp has been and is likely to continue to be substantially and irreparably injured in its business, customer relationships, goodwill, and other proprietary interests, and the threat of continued injury to its business, customer relationships, goodwill, and other proprietary interests outweighs any harm the issuance of an injunction may impose upon Stefánsson.

111.   NetApp has a substantial likelihood of success on the merits of its claims.

112.   The Court's entry of the requested injunction will serve the public interest by protecting NetApp's trade secrets and legitimate business interests.

113.   NetApp therefore demands judgment against Stefánsson:

(a) Preliminarily and permanently enjoining Stefánsson, his officers, agents, servants, employees, attorneys, and all persons or entities in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from:

(i) Using any of NetApp's confidential and proprietary information, including any information Stefánsson relied upon in building the cloud control plane and service delivery platform that Red Stapler allegedly developed.

(ii) Using any Invention that Stefánsson "conceived, reduced to practice, created, derived, developed, or made" while at NetApp, including any "discoveries, designs, developments, technology . . . (whether or not protectable under patent laws)," "works of authorship, software programs or subroutines source or object code . . . (whether or not protectable under copyright laws)," as well

as "know-how and ideas (whether or not protectable under trade secret laws)." PIIA §§ 6, C.1–2.

    (iii)    Soliciting or in any way interfering with any of NetApp's relationships with its current employees, customers, Business Partners including NetApp's hyperscaler partners, and contractors.

(b) Ordering Stefánsson to disclose any Inventions that he "conceived, reduced to practice, created, derived, developed, or made," including any "discoveries, designs, developments, technology . . . (whether or not protectable under patent laws)," "works of authorship, software programs or subroutines source or object code . . . (whether or not protectable under copyright laws)," as well as "know-how and ideas (whether or not protectable under trade secret laws)" developed in the six months following the end of his employment at NetApp. PIIA §§ 6, C.1–2.1–2.

(c) Ordering Stefánsson to return all NetApp's confidential and proprietary information and to assign NetApp all rights to Inventions developed while at NetApp, including any previously undisclosed Invention relating to Red Stapler's cloud control plane and service delivery platform.

(d) Ordering Stefánsson to assign ownership rights to all ideas and designs, and their derivatives, developed while employed by NetApp, including all intellectual property of Red Stapler.

## DEMAND FOR JURY TRIAL

NetApp hereby demands a trial by jury of all issues so triable.

Dated:    November 6, 2025                    Respectfully submitted,


                                      */s/ Nathan M. Berman*
                                      Nathan M. Berman
                                      FBN: 0329230
                                      nberman@zuckerman.com
                                        Zuckerman Spaeder LLP
                                        101 E. Kennedy Blvd., Suite 1200
                                        Tampa, Florida 33602

813-221-1010
813-223-7961 (Fax)

Katherine Vidal
California Bar No. 194971
KVidal@winston.com
WINSTON & STRAWN LLP
1901 L Street,
N.W. Washington, D.C. 20036-3506
Telephone: (202) 282-5000
Facsimile: (202) 282-5100
WINSTON & STRAWN LLP
255 Shoreline Drive, Suite 520
Redwood City, California 94065
Telephone: (650) 858-650 0
Facsimile: (650) 858-6550

John C.C. Sanders, Jr.
Texas Bar No. 24057036
JSanders@winston.com
Dylan J. French
Texas Bar No. 24116393
DFrench@winston.com
Jennifer Moroney Iorio
Texas Bar No. 24138582
JIorio@winston.com
Matthew J. Wurst
MWurst@winston.com
Texas Bar No. 24137303
WINSTON & STRAWN LLP
2121 North Pearl Street, Suite 900
Dallas, Texas 75201
Telephone: (214) 453-6500
Facsimile: (214) 453-6400

*(Pro hac vices forthcoming)*

*Attorneys for Plaintiff NetApp, Inc.*