**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| NETAPP, INC.,<br><br>Plaintiff,<br>v.<br><br>JÓN THORGRÍMUR STEFÁNSSON,<br><br>Defendant. | Case No. 6:25-cv-02130<br><br>Hon. Judge Julie S. Sneed |

# DEFENDANT JÓN THORGRÍMUR STEFÁNSSON'S[1] CLOSING ARGUMENT IN FURTHER OPPOSITION TO NETAPP, INC.'S MOTION TO CONVERT TEMPORARY RESTRAINING ORDER INTO PRELIMINARY INJUNCTION

[1] Stefánsson reserves and does not waive his jurisdiction and venue arguments. ECF No. 36.

The Court's January 12, 2026 evidentiary hearing confirmed that NetApp, Inc. ("NetApp") is not entitled to the extraordinary relief of a preliminary injunction. The Motion for a Preliminary Injunction (ECF No. 15) ("Motion") should be denied.

As an initial matter, this Court cannot enter injunctive relief until NetApp demonstrates that venue and jurisdiction are proper.[2] This action was not properly filed here. As demonstrated in Stefánsson's Motion to Dismiss (ECF No. 36) and the January 5 hearing, this case should be dismissed for *forum non conveniens* based on the mandatory forum selection clause in NetApp's employment agreement, and because NetApp has not pleaded a basis for personal jurisdiction—at the hearing, NetApp itself admitted it may need to amend its Complaint. ECF No. 105 at 47:5-9 ("If Your Honor would like us to amend the complaint, it's a simple amendment.").

Even if jurisdiction were established and venue proper, NetApp failed to demonstrate a substantial likelihood of success on the merits, because it offered no evidence showing that Stefánsson misappropriated its trade secrets or breached his agreements with NetApp. First, NetApp offered no forensic evidence supporting its claims. NetApp's forensic examiner admitted that he was speculating on what was "likely" or he "expected" he might find when his investigation concluded—not what he *knew*. ECF No. 126 ("Tr.") at 113:25-114:3, 117:3-20, 118:9-20. NetApp repeatedly

[2] *See Ladenburg Thalmann & Co. v. Oragenis, Inc.*, 2024 WL 2945490, at *15 (S.D. Fla. May 3, 2024), *R&R adopted*, 2024 WL 2938821 (S.D. Fla. June 11, 2024) (injunction denied based on venue selection clause); *Proliant, Inc. v. Savant HCM, LLC*, 2018 WL 1936528, at *2 n.2 (N.D. Ga. Jan. 25, 2018) (motions for injunctive relief "moot" for lack of personal jurisdiction). Because NetApp did not introduce any evidence on these issues at the hearing, Stefánsson rests on his papers. ECF No. 37.

reminded the Court that his investigation was ongoing, *id.* at 97:10-13, 132:18-19, and much of his testimony (and NetApp's overall argument) was improperly based on new evidence not included in NetApp's Motion. Courts often refuse to consider such new evidence and arguments, as the Court should do here.[3] Regardless, what NetApp's examiner described was, at most, potential *deletion*—not misappropriation—of personal and other files as Stefánsson wound up his affairs at NetApp and an automatic "default" syncing of files no one at NetApp could testify contained trade secrets. Tr. at 160:16-161:6.[4] The remainder of his testimony was directed at a different NetApp employee, Grímur Jónsson ("Jónsson"), guessing what he might have copied. But there was no evidence that those actions had anything to do with Stefánsson.

Second, NetApp's attempted reliance on a press release issued by VAST following the acquisition of Red Stapler fell apart at the hearing. NetApp's witnesses conceded that the terms that gave rise to NetApp's concerns—"cloud control plane" and "service delivery platform"—are *completely generic* industry terms used by all cloud businesses. *Id.* at 156:23-157:8. The reliance on the press release also reveals a flaw in the foundation of NetApp's argument: the unfounded assumption that Red Stapler provided a fully developed "cloud control plane" or "service delivery platform" to

---

[3] *United States v. Landazuri Arboleda*, 553 F. Supp. 3d 1107, 1126-27 (M.D. Fla. 2021) (improper to raise new arguments at evidentiary hearing); *Wickapogue 1 LLC v. Blue Castle (Cayman) Ltd.*, 657 F. Supp. 3d 234, 239 n.4 (E.D.N.Y. 2023) (during PI hearing "Plaintiffs raised a new argument …. The Court will not consider arguments or evidence that were not raised or attached to Plaintiffs' moving papers."); *City of Tombstone v. United States*, 2012 WL 12842260, at *2 (D. Ariz. Mar. 1, 2012) (same).

[4] Unlike the typical trade secret case where a plaintiff can show that its customers have been contacted or its software is being misused, NetApp presented no evidence that, even if some files had been inadvertently "synced," they have ever been misused or disclosed.

VAST. There was no evidence to support this speculation. To the contrary, the evidence showed that Red Stapler had no intellectual property or product when it was acquired (for immaterial consideration essentially amounting to an employee signing bonus). Moreover, NetApp admitted that the product it is seeking to protect is a *first-party* cloud offering (repeatedly referred to as its "secret sauce"), but the evidence shows that Stefánsson has only worked on a *third-party* marketplace product since leaving NetApp. NetApp's *own witnesses* said this is an entirely different product, something thousands of companies have. *Id.* at 59:22-61:3.

Third, NetApp entirely failed to establish the existence any specific, protectable trade secret or confidential information that Stefánsson or Jónsson may have had when they left NetApp after seven years of service. Indeed, NetApp abandoned any pretense of having a trade secret and focused on new arguments never made in its Motion regarding documents that *might* relate to its "valuable partnerships" with companies because they had "NFL" or "Chevron" in the titles. NetApp's witnesses had no idea whether any of these documents (or the other documents, which he never reviewed) even contained trade secrets—and there was no evidence that these documents have ever been used or disclosed. NetApp's attempt to cast these relationships or generic industry terms as protectable trade secrets fails under Eleventh Circuit law, which rejects application of trade secret protection to vaguely defined terms or concepts.

Finally, NetApp failed to establish that the incredible breadth it seeks in its proposed preliminary injunction is warranted. NetApp has already conceded that the initial proposed injunction order it provided to the Court was overbroad and not the

"obey the law" relief it represented to the Court. Recognizing this overbreadth, NetApp has twice provided revised versions of its proposal. ECF No. 41 at 5; Tr. at 27:1-21. Even NetApp's revised proposals bear little resemblance to the evidence actually put forth in this case. NetApp's serial revisions underscore its ever-changing theories and efforts to obtain relief wholly unconnected to the evidence.

Ultimately, the evidentiary hearing revealed NetApp's claims for what they are: a fear that a talented engineer would help "one of [NetApp's] most concerning competitors" eventually achieve the success he built for NetApp. Tr. at 52:19. But Stefánsson is not bound by any non-compete obligations. And NetApp's fear that Stefánsson will work to make VAST successful is not evidence of misappropriation.[5] The overwhelming weight of the evidence shows that (1) no new product was built while Stefánsson was still at NetApp; (2) no product was sold to or acquired by VAST; (3) any purported trade secrets concerning a first-party offering would be completely incompatible with the work Stefánsson did at Red Stapler and is doing at VAST; and (4) Stefánsson's current work for VAST is on technology that NetApp's counsel itself called outdated and is irrelevant to what its counsel called NetApp's "secret sauce," its first-party offering. For these reasons, those detailed below, and those outlined in Stefánsson's Opposition to NetApp's Motion (ECF No. 37), NetApp has not carried its burden to show the extraordinary relief of a preliminary injunction is warranted.

[5] "[A]n employer may not preclude its former employee from utilizing contacts and expertise gained during his former employment." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (internal quotation marks omitted).

## BACKGROUND

When NetApp filed this case and immediately sought an *ex parte* temporary restraining order, it told the Court that injunctive relief was necessary because Stefánsson had (1) ignored its cease-and-desist letters, (2) upon receipt of those letters, "fled to Iceland," (3) been "active" in developing software for another company while still at NetApp, and (4) already developed a competing product for VAST. ECF No. 3 at 1–2, 11–12. The evidence shows that none of this was true. Stefánsson responded to NetApp's letters, told NetApp in *June* he was returning to Iceland, and never developed a competing product while at NetApp or Red Stapler. ECF No. 37 at 1–3.

When the initial justification for the preliminary relief fell apart, NetApp was forced to pivot to new theories. Thus, the evidentiary hearing concerned an entirely different set of evidence, unrelated to NetApp's initial submissions to this Court. Without waiving his objections to the wholly improper nature—procedurally and substantively—of this bait-and-switch, *see supra* n.1, the new evidence and arguments presented at the evidentiary hearing are addressed below.

## ARGUMENT

NetApp's claims and its Motion are predicated on its allegations that Stefánsson breached his confidentiality agreement (the "PIIA") and violated the DTSA and FUTSA by using or disclosing NetApp's trade secret information without authorization. Compl. ¶¶ 44–113. NetApp carries the burden of showing the existence of specific, protectable trade secrets, and that Stefánsson misappropriated those trade secrets by knowingly *disclosing* or *using* them. Mot. at 12–14; *see also* 18 U.S.C.

§ 1839(5)(B) (requiring "disclosure or use"); Fla. Stat. § 688.002(2) (same). NetApp's contract claim, as it also concedes, similarly requires it to show that Stefánsson violated "the non-use and non-disclosure clause" in the PIIA. Mot. at 9.[6] Absent evidence of an *actual disclosure* to another or *use* of a purported trade secret, a preliminary injunction cannot be granted.[7]

NetApp failed to meet its burden to establish a substantial likelihood that it is "'likely or probable' to prevail at trial."[8] In fact, NetApp failed to present *any* evidence that (1) Stefánsson knowingly obtained any NetApp confidential material, (2) Stefánsson *disclosed* or *used* any NetApp confidential material, and (3) as to any of the materials that NetApp speculates he *may* have had at some unknown point, that those materials contain specific, protectable trade secrets.

## I. NetApp Failed to Show a Substantial Likelihood of Success on the Merits.

### A. NetApp Failed to Show Any Evidence of Misappropriation or Breach of Stefánsson's Nondisclosure Obligations.

During NetApp's opening, it promised that it would present evidence through its "forensic expert," Kevin Clarke, that Stefánsson or Jónsson "exfiltrated confidential NetApp data" and "stole key IP." Tr. at 23:25-24:10.[9] As the Court heard

---

[6] NetApp did not present any evidence of any purported breaches of the non-solicitation or other clauses in the PIIA. For the reasons stated in Stefánsson opposition, *see generally* ECF No. 37, there is no basis for injunctive relief on those provisions because there is no risk of present or future violations.

[7] *See Foundever Operating Corp. v. Hahn*, 2023 WL 7496150, at *12 (M.D. Fla.) (compiling Florida cases denying preliminary injunctions where there was no evidence of a trade secret disclosure or use).

[8] *Humana, Inc. v. Cushing*, 2020 WL 5100061, at *4 (S.D. Fla. July 30, 2020) (a "toss up" is not enough) (citing *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005)).

[9] These representations also appeared prominently on the demonstrative NetApp told Stefánsson it planned to use only minutes before the hearing. After the hearing, Stefánsson requested that NetApp provide a .pdf copy of that opening demonstrative, but NetApp did not do so.

over the course of Clarke's testimony, he could not confirm ***any*** of this, and he could do no more than guess what might have happened. Speculation is not enough.[10]

Clarke testified concerning his examination of ten different laptops and phones, as well as materials provided to him by NetApp, most of which were not presented in NetApp's Motion or disclosed to Stefánsson before the hearing. Tr. at 99:14-25. But even with months to conduct this one-sided investigation, Clarke admitted that he had not found actual evidence of exfiltration. Instead, he only found a handful of purported "red flags" (a concept he had trouble defining, *id.* at 100:4-22),[11] each discussed below.

**1. There Is No Evidence That Stefánsson "Exfiltrated" Any Protectable or Confidential Information.**

***Stefánsson "Deletions."*** Clarke testified that he saw evidence that Stefánsson deleted files as he was leaving. But evidence that files were *deleted*, absent a showing of misuse or disclosure, do not support a claim for misappropriation.[12] NetApp provided no evidence of misuse or disclosure. Moreover, although Clarke described this as a "red flag," Stefánsson explained that, when he prepared the computer to voluntarily return it to NetApp, he tried to get rid of personal files and files that *were already on NetApp systems*, having never received any instruction otherwise. Tr. at 265:4-24. NetApp never cross-examined Stefánsson on these issues or challenged his

[10] *Infinite Energy, Inc. v. Chang*, 2008 WL 11344672, at *2 (N.D. Fla. Jan. 9, 2008); *Delivery Kick Holdings, Inc. v. RJ Brooksher LLC*, 2025 WL 896002, at *3 (M.D. Fla. Mar. 24, 2025); *KeyView Labs., Inc. v. Banger*, 2020 WL 8224618, at *6 (M.D. Fla. Dec. 22, 2020), *R&R adopted*, 2021 WL 510295 (M.D. Fla. Feb. 11, 2021).

[11] NetApp never provided these "red flag" reports in advance of the hearing, never listed them on its exhibit list, and has not provided them when asked after the hearing.

[12] *See Presidio Holdings Inc. v. People Driven Tech., Inc.*, 2025 WL 947946, at *6 (N.D. Ill. Mar. 30, 2025) ("inferring misappropriation from [former employee's] file deletion is too big a leap").

testimony, let alone presented any evidence suggesting that Stefánsson was removing files from the NetApp system or purging information to conceal it. To the contrary, Clarke admitted that employees remove personal files when leaving a company. *Id.* at 106:24-107:9. Clarke said that what he looks for in these cases is an employee who transfers a file off the computer and *then* deletes it, but here, he saw no evidence that Stefánsson ever transferred or copied these deleted files. *Id.* at 109:11-20.

***Stefánsson iCloud "Syncs."*** Although NetApp promised evidence that Stefánsson "exfiltrated" files by syncing them to his "personal cloud storage," Tr. at 24:7-23, on cross-examination, Clarke admitted the evidence showed no such thing.

***First***, Clarke admitted that there was no actual evidence that files had been "synced" to Stefánsson's account. *Id.* at 103:25-104:1 ("Because the iCloud account was disconnected, we have no evidence of the syncing."). ***Second***, Clarke conceded that, even if files had synced, he had no idea *when* they had synced—it could have been anytime during Stefánsson's seven-year tenure at NetApp. *Id.* at 104:2-5 ("We do not know when the documents would have been synced.").[13] In fact, Clarke testified that NetApp had "metadata" associated these files, *id.* at 102:15-103:3, and thus had every ability to show the Court when the files were created or synced—NetApp's decision not to present that metadata undermines any inference that these files were created or synced in connection with Stefánsson's departure. ***Third***, Clarke admitted that he had

[13] The document titles suggested that the syncing could have been in 2021 (when Stefánsson had every reason to copy a working file during his around-the-clock travel). Tr. at 103:10-11; *see also Pliteq, Inc. v. Mostafa*, 775 F. Supp. 3d 1231, 1251 (S.D. Fla. 2025) (previously downloading information when travelling for work "weighs against misappropriation").

no idea whether any of these files had protectable trade secret information. As discussed *infra*, no witness knew whether the documents contained trade secrets. ***Fourth***, Clarke described how this "syncing," if it occurred at all, is a default setting on MacBooks. *Id.* at 101:9-12 ("Typically, iCloud is enabled by default on Mac devices."). Clarke volunteered that he would expect every MacBook device to sync with an iCloud account by default. *Id.* at 101:14-15 ("[I]n general, yes, they would be – I would expect them to be syncing."). A default sync would not be a knowing or intentional transfer of files—Clarke agreed it would happen automatically. *Id.* at 101:20-102:1.

Rather than suggest misappropriation, Clarke's testimony suggests that NetApp failed to take reasonable measures to protect its confidential information by allowing syncing.[14] *Id.* at 101:6-19. NetApp's corporate representative Sanjay Kumar, admitted that these default syncs "will happen," and he was "not sure, actually, whether NetApp has any way to protect that," if it had even tried. *Id.* at 162:13-23. NetApp then called its chief security officer to explain this deficiency—but he admitted that any employee (like Stefánsson) who logged into iCloud with an older MacBook could be automatically "syncing" in the same manner that Clarke described—and that NetApp's "fix" for this issue had not been rolled out to older computers. *Id.* at 162:8-23, 170:21-171:6, 172:4-20 ("But if you had an older version of a Mac, it might have been possible to have turned it on.").[15]

[14] *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1300-01 (11th Cir. 2018) (affirming rejection of trade secret claim where plaintiff "failed to reasonably protect the information").
[15] NetApp tried to introduce evidence at the end of the day that a written policy purportedly prohibiting use of iCloud accounts as of ***late 2024*** (well after when this sync may have occurred). But Stefánsson

This was the ***only*** evidence NetApp presented to argue Stefánsson himself purportedly "exfiltrated" data. Not a single witness or document demonstrated that any protectable trade secret information was ever transferred or taken by him, let alone that any such information was actually used or disclosed to a third party. To the contrary, Stefánsson testified that he never knowingly transferred or received *any* NetApp information, never tried to "sync" documents, seldom ever even looked at the iCloud account where documents might have "synced," and never used or disclosed any "synced" information, if it even exists.[16] *Id.* at 256:11-256:21, 266:2-267:10, 270:8-271:1. NetApp never rebutted or even cross-examined Stefánsson on these issues.

**2. There Is No Evidence that Jónsson "Exfiltrated" Trade Secrets.**

The remainder of the evidence of "exfiltration" concerned Jónsson, another NetApp employee who left for Red Stapler. Throughout the hearing, NetApp conflated his actions with Stefánsson's, but courts in this District reject attempts to impute the conduct of co-workers without evidence that the conduct was done with the defendant's knowledge.[17] NetApp never presented any evidence that Stefánsson

---

had never seen the policy, Tr. at 280:25-281:3, NetApp did not admit it into evidence, and Kumar appeared to be unaware of it. He said "no" when asked if he was "aware of anything NetApp had done" to prevent "syncing." Tr. at 162:18-23.

[16] NetApp's argument that Stefánsson's testimony is self-serving is plainly insufficient to carry NetApp's burden. The Eleventh Circuit has made clear that "self-serving" testimony, when unrebutted, should be considered and is sufficient to preclude summary judgment. *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir.) ("Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.").

[17] *See Liberty Am. Ins. Grp., Inc. v. WestPoint Underwriters, LLC*, 199 F. Supp. 2d 1271, 1286 (M.D. Fla. 2001) (refusing to impute retention of "source code" to other defendants where "there was no direct evidence that [other defendants] knew" source code was retained or could have been used); *Arthrex, Inc. v. Hilton*, 2022 WL 685496, at *12 (M.D. Fla. Mar. 8, 2022) (similar); *see also Corp. Ins. Advisors, LLC v. Addeo*, 2021 WL 6622154, at *11 (S.D. Fla. Dec. 8, 2021), *R&R adopted*, 2022 WL 204689 (S.D. Fla. Jan. 24, 2022) (refusing to impute conduct across co-workers).

had knowledge of Jónsson's purported conduct, and never cross-examined him on his unrebutted testimony that he had no such knowledge. Tr. at 273:11-274:9.

***Jónsson "gimmim2home.zip" file.*** Although NetApp promised in its opening that Clarke would testify to Jónsson's purported "exfiltration" of NetApp information through a large zip file called "gimmim2home.zip," Clarke admitted that he does not know whether this file was ever transferred to an external drive. Tr. at 112:6-114:3 ("So as far as you're willing to go today is that you expect it would have been [transferred], but you don't know?" "Correct."). Although he had gone further in his direct, on cross he was reminded that in his declaration, he had only speculated that it was "likely," and again admitted that he did not "know." *Id.* Clarke also admitted that he had no reason to believe that this zip file had anything to do with an "exfiltration" as Jónsson left NetApp. Tr. at 124:22-125:8. He admitted that he had concluded that this zip file was created ***eight months*** earlier and did not know whether it was done to transfer data from Jónsson's older "M2" computer. *Id.* at 132:20-133:6. Neither Clarke nor any other witness provided testimony that this 2024 file, which seemed to have been a backup of Jónsson's personal files, Google files, and other folders, had anything to do with Stefánsson. *Id.* at 126:16-127:19.

Moreover, NetApp never established what was included in this zip file. Although there was testimony that it comprised "hundreds of thousands" of files, there was only a single document (Pl. Ex. 13) showing a few pages of file names. That

document was a heavily redacted and modified version[18] of a longer file list that NetApp determined it could not use at the hearing, even though NetApp's counsel repeatedly tried to describe the much longer document (to sustained objections) during Clarke's testimony. Tr. at 81:25-83:8. The shorter document, Clarke conceded, showed only a handful of files apparently unrelated to NetApp (personal and Google files) and some zero byte folders, with the columns removed and edited to hide their "attributes." *Id.* at 127:8-129:21. Although Clarke said he remembered reviewing a longer list that was in a "NetApp" folder, he was unable to testify regarding what was in that file, testifying only that he remembered that they were in a folder called "src," which he said ***could*** mean "source code." *Id.* at 88:10-21. Clarke otherwise admitted he had no idea whether there was any protectable materials in them. *Id.* at 129:6-21.

The only witness who could speculate further as to what may have been in those folders was Kumar, but what he did was "compare" the file directories in the zip file (from September 2024) to file directories on the NetApp system a month ago. He surmised that those file directories at NetApp likely would contain "source code" for its cloud control plane. *Id.* at 154:2-21. On cross-examination, the flaws in this "comparison" became clear. First, he admitted that an empty and redacted file directory from 2024 may not have the same files as NetApp's late-2025 directory. *Id.*

---

[18] Stefánsson objected to the use of Pl. Ex. 13, which has never been provided to Stefánsson in unredacted form. Clarke testified that he did not know how the longer 18,000-page document NetApp prepared had been modified and rewritten into the seven-page document NetApp used at the hearing. Tr. at 84:13-86:10; 123:17-24. Stefánsson also objected because neither he nor his attorneys were given the unredacted version, which had only been created after Stefánsson filed a motion to exclude the 18,000 page document. ECF No. 96. There is no evidence anywhere in the record showing who created the document, how it was created, or what was redacted.

at 159:2-11. He never compared the file list to what existed at that time. *Id.* Second, he admitted that nothing in Ex. 13 showed *any source code* from the zip file—he was testifying to what he thought was *behind* the redactions. *Id.* at 160:9-12. And he admitted that this source code concerning the completely generic concepts that he admitted most cloud companies have. *Id.* at 160:1-15. Third, the vagueness and imprecision in his testimony (a generic reference to "source code") undermined any argument that somewhere in this purported code was a protectable trade secret.[19]

***Jónsson "M3" attempted transfers.*** The only testimony that the "gimmim2home.zip" file ever may have left Jónsson's computer (which NetApp has) was Clarke's testimony that he saw evidence of an "expected" transfer. *Id.* at 111:11-21. During cross, he again conceded that there was less here than NetApp promised.

First, he admitted that his testimony was based entirely on his review of "rsync" commands found on Jónsson's computer. *Id.* at 111:16-21. "Rsync" commands show *attempted* transfers to a destination path—they do not include "a progress log or anything" showing a transfer actually occurred. *Id*. at 112:1-7. Clarke admitted that he had never seen any document showing a completed transfer, and more importantly, admitted he has never "seen any document that among those files was the gimmim2home.zip drive." *Id.* at 112:13-15; 113:20-24 ("There is no log or information

[19] *See IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 583–84 (7th Cir. 2002) (description of software failed to "separate the trade secrets from the other information that goes into any software package"); *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated.").

showing that that file was successfully transferred to that external drive."). Instead, the most Clarke could say was that NetApp had given him, a "chat transcript from IT," in which they reported a file transfer on May 24. *Id.* at 112:8-12. This "chat transcript" was never introduced in evidence, and likely for good reason: Stefánsson previously testified to his understanding that Jónsson had at one point transferred personal files "with NetApp's IT department knowledge." ECF No. 42-1 at ¶ 3. NetApp never contested that IT permitted Jónsson to make a file transfer, and did not explain why, if IT detected an unauthorized transfer in ***May 2025***, it did nothing about it for months.

Second, although Clarke had previously told the Court that these "rsync" commands showed "at least seven instances where data was potentially copied," ECF No. 15-1 at ¶ 6, Clarke was forced to admit at the hearing that this was a dramatic overstatement, acknowledging that, as to the first ***five*** of these seven instances, they had "been cancelled or not completed" and there was no transfer of information. Tr. at 115:5-24, 117:3-20. He speculated that the sixth and maybe seventh transfer could have been successful, but he was again relying entirely on the "chat transcript" not presented to the Court and admitted he would need to see the destination drive to know if any transfer had been successful. *Id.* at 114:2-3.

Third, on cross-examination, it became clear why NetApp had chosen not to present Clark's printout of "rsync" commands to the Court: it shows conclusively that the person entering these "rsync" commands was trying ***not*** to transfer NetApp information. The printout (Pl. Ex. 12) showed the "rsync" commands included *dozens* of ***exclusions***—instructions to ***not*** transfer files. Clarke admitted that an exclusive

instruction was a "switch off," to say "Don't copy this while you're copying the rest of this source path." Tr. at 119:25-120:4. These exclusions were used to prevent copies of files/folders/directories with the word "NetApp" and a variety of other words and terms relating to software development and coding. When Stefánsson was able to review this printout during his examination, he testified that this seemed to be someone "going above and beyond to make sure that he's not—not downloading any development builds or environments or anything that actually has the name 'NetApp' in it." *Id.* at 272:3-9. He explained that the purpose of using words like "NetApp," "environment," or "libraries" was to exclude anything in the "built environment or any source code." *Id.* at 272:10-24. Indeed, when Clarke was asked the purpose of the "long list of all these different types of files," he agreed that "***a purpose for putting them there is to not copy those files***." *Id.* at 122:7-11 (emphasis added). Thus, if Jónsson did run these "rsync" commands, he specifically added these exclusions to try to *exclude* NetApp software or source code from being copied.

Most critically, none of Clarke's findings regarding Jónsson had anything to do with Stefánsson, who had never seen the zip file or its contents and testified that nothing Jónsson may have transferred had ever been used by him or at Red Stapler. *Id.* at 273:11-275:3. NetApp never challenged this testimony or cross-examined Stefánsson on these topics. Although Clarke said he saw evidence of "collaboration" among Stefánsson and others as he was leaving NetApp, *id.* at 77:23-79:10, he admitted that his evidence of "collaboration" ultimately was limited to reviewing a

transcript of employees "on a chat string together" to discuss leaving NetApp.[20] *Id.* at 105:14-19. NetApp's evidence showed no discussions beyond this, and the Eleventh Circuit has rejected attempts to show misappropriation from "circumstantial evidence" like employees deciding to leave a company.[21]

**3. NetApp's Remaining Evidence That a GitHub Repository Was Created While Stefánsson Was at NetApp Is a Red Herring.**

Although NetApp said it had evidence that Stefánsson was "working and developing source code" in a GitHub code repository while still at NetApp, Mot. 10, 14, the evidentiary hearing revealed this to be another empty representation. The repository, in fact, was a newly-created but ***empty*** repository, the equivalent of creating a new email account with an empty inbox. *See* Tr. at 248:4-249:8. NetApp's only evidence, again presented through Clarke, did not show otherwise: it introduced an email invitation for the new GitHub repository, sent after Stefánsson resigned, and an email showing that GitHub had run a free scan over the repository, finding no confidential "secrets." *Id.* at 90:5-23, 95:17-95:20. Clarke admitted that neither email showed that there was anything in the repository, and that he did not "have any evidence of what was in the GitHub account." *Id.* at 95:17-96:6. Clarke's testimony was wholly consistent with Stefánsson's—a new repository had been created after he

[20] Although Clarke liberally used words like "collaborators," when asked if he had any basis to determine whether someone talking to a potential new employer was a "collaborator," he quickly retreated, saying "I -- I wouldn't know. My -- obviously, my role as a forensic expert isn't necessarily the people side of the business." Tr. at 104:10-15. He also denied expertise in this area, admitting it was "not [his] role to determine a motive for communications." *Id.* at 105:3-8.

[21] *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1293 (11th Cir. 2003) (affirming summary judgment where no "direct evidence" of misappropriation); *see Pals Grp., Inc. v. Quiskeya Trading Corp.*, 2017 WL 532299, at * 4 (S.D. Fla. Feb. 9, 2017) (suspicion without actual evidence is insufficient).

resigned from NetApp, but there was no content in it.[22] *Id.* at 248:21-249:23.

### B. NetApp Failed to Show Any Evidence That the Materials Referenced in its Opening Statement Contained Any Protectable Trade Secrets.

Even more fundamentally, NetApp failed to present any evidence showing what protectable trade secrets it believes Stefánsson "exfiltrated" from NetApp. Indeed, NetApp failed to establish that any protectable trade secrets were included in the purportedly misappropriated materials, foreclosing a preliminary injunction.[23]

The primary basis of NetApp's request for the extraordinary relief of a preliminary injunction is a VAST press release using the phrases "cloud control plane" and "service delivery platform." Pl. Ex. 4. According to NetApp, those phrases indicated Stefánsson *must have* stolen *something* from NetApp. Tr. at 20:12-21:23, 22:9-11, 54:5-22, 141:21-142:10. But there are three problems with NetApp's speculation.

For one, NetApp's corporate representative conceded that the phrases "cloud control plane" and "service delivery platform" are "generic term[s]" used by "lots of companies" and "pretty much … every single cloud system." *Id.* at 156:23-157:8, 200:3-16. The press release's reference to hyperscalers is similarly generic. NetApp's Vice President of Product Marketing agreed that "most companies have some sort of relationship with the hyperscalers," including VAST. *Id.* at 60:14-21; *see also id.* at

---

[22] This is consistent with the "secret scan" email, which Stefánsson testified would happen automatically when someone logs in to the repository for the first time. Tr. at 250:2-11. The email was received on July 8, when Stefánsson testified the first commit was made to the GitHub. *See* Pl. Ex. 41.

[23] *Alternative Med. Integration Grp., L.P. v. Langford*, 2014 WL 12572738, at *4 (M.D. Fla. Aug. 1, 2014), *R&R adopted*, 2014 WL 12575821 (M.D. Fla. Aug. 19, 2014); *Beecher Carlson Holdings, Inc. v. Stern Risk Partners LLC*, 2015 WL 13306360, at *6 (N.D. Ga. May 1, 2015); *Diagnostic Reference Grp., LLC v. Robb*, 2015 WL 13892146, at *5 (N.D. Ga. July 28, 2015).

258:15-17. A press release using "generic" industry terms adopted by "every single cloud system" and describing business partners shared by "most companies" says nothing whatsoever about any protectable NetApp trade secrets. *Id.* at 156:23-157:8.

Second, these generic terms have nothing to do with NetApp's concern that VAST had "NetApp's secret sauce through acquiring Red Stapler." *Id.* at 20:21-23. NetApp's "secret sauce," it said, is its first-party offering. *Id.* at 17:14-18:1. But the evidence shows that VAST has a third-party marketplace offering. *Id.* at 18:13-18, 50:2-9, 239:7-14. Stefánsson testified that VAST did not and does not have a first-party offering, and he is not working on one. *Id.* at 258:21-259:6. NetApp did not cross-examine Stefánsson on this topic, and it presents no evidence to support its speculation that Stefánsson brought or is bringing a first-party offering to VAST. *Id.* at 54:2-55:4.

Third, NetApp's overreaction is based on the faulty assumption that Red Stapler brought a developed "cloud control plane" or "service delivery platform" to VAST. *Id.* at 54:20-55:4, 164:4-18 (Kumar: "I'm assuming now Red Stapler had similar kind of product, and that's why VAST was, like, interested in buying that."). But this assumption is belied by the evidence. Red Stapler had developed no product at the time it was acquired by VAST, and VAST, therefore, acquired no product from Red Stapler. Def. Exs. 15–16; Tr. at 187:10-17, 199:5-11, 260:2-8, 260:25-261:2, 263:5-21, 264:6-10; *see also id.* at 196:17-23, (describing "Polaris" as what the Red Stapler team *planned* to work on at VAST); *id.* at 199:5-11 (explaining that Red Stapler is bringing *expertise* to VAST, not IP); *id.* at 264:6-10 (describing Polaris as "[i]n its infancy" when Red Stapler was acquired). Not only would NetApp's IP have been unusable for any

VAST product, the VAST marketplace offering that Red Stapler is working on is still in development. *Id.* at 199:5-11, 256:25-257:8. Thus, NetApp's conclusion that Stefánsson must have used its unidentified "trade secrets" to build new product in a ten-week timespan is pure speculation, which cannot support a preliminary injunction.[24] Nor can NetApp's general fear that Stefánsson—who is not subject to a non-compete, *id.* at 12:24-25, 177:23-25—might use his expertise to provide value to "one of [NetApp's] most concerning competitors." *Id.* at 52:18-19. This unfounded speculation does not carry NetApp's burden to present competent evidence demonstrating a substantial likelihood that Stefánsson misused or misappropriated specific, protectable trade secrets in violation of the PIIA or trade-secret laws.[25]

What NetApp is left with, then, is a list of the names of the files it claims Stefánsson "exfiltrated" from his NetApp computer at some unknown time. *See supra*. NetApp's corporate representative, Kumar, conceded that he "would actually have to look at the exact documents to know if there's a trade secret in there or not"—which he never did. *Id.* at 161:7-10. In fact, not a single NetApp witness ever saw the contents of the files themselves. They did not know when the files were created (though NetApp knows), and they do not know when the sync allegedly took place. *Id.* at 102:18-104:5, 160:13-161:10. In the absence of this information, NetApp relies solely on a list of file names of the documents presented in a demonstrative exhibit—one of several that

[24] *ActivEngage, Inc. v. Smith*, 2019 WL 5722049, at *5 (M.D. Fla. Nov. 5, 2019) (defendant was working on different product, so no evidence of misappropriation); *Infinite Energy*, 2008 WL 11344672, at *2.
[25] *Alternative Med. Integration Grp*, 2014 WL 12572738, at *4; *Beecher Carlson Holdings*, 2015 WL 13306360, at *6; *Diagnostic Reference Grp.*, 2015 WL 13892146, at *5.

NetApp did not disclose to Stefánsson until the hearing, which were filled with assumptions and details that never actually appeared in the evidence[26]—to surmise that there *may have been* be trade secrets in some of the documents.

The available evidence instead suggests that the purportedly synced documents contain no trade secrets. Although Stefánsson has not seen the documents (or, until the hearing, the list of documents), he can tell that some of the contents of the documents are publicly available—like "332_JonsiStefansson-AI Demo_PMT," a document reflecting his keynote remarks from a public conference, broadcast on YouTube. *Id.* at 269:3-22. He can also discern that some of the documents are unrelated to NetApp. For example, one document references YAY, an entirely different company; Stefánsson is chairman of the YAY Board. *Id.* at 269:23-270:7. And, based on the file name alone, "October 19 2021 PCS 3 Year Plan.pptx" appears to be a three-year plan from more than five years ago—there is no evidence that it contains protectable trade secrets *today*. Indeed, the mere fact that NetApp permitted the documents to automatically sync to an employees' personal iCloud is powerful evidence that they cannot contain protectable trade secrets.[27] *Id.* at 101:6-14, 162:4-12; *see also id.* at 170:10-25.

At the hearing, NetApp also pointed to documents with file names containing the words "Chevron" and "NFL," suggesting that those documents might include

---

[26] Several times, Stefánsson asked whether NetApp would lay any foundation for this file name list. It did not—there is no evidence showing that these files were actual included in the sync.

[27] NetApp's failure to protect the security of this information destroys any possible trade secret protection. *Yellowfin Yachts*, 898 F.3d at 1300.

confidential information because those are important customers to NetApp. Notwithstanding the impropriety of this new argument, NetApp offered no evidence as to what was actually contained in those files. The mere fact of the partnerships with those companies is not itself a trade secret; it is public. Indeed, information about those partnerships is touted on NetApp's website.[28] NetApp asserts that some information about those partnerships is confidential, but "not all confidential information rises to the level of a trade secret,"[29] and NetApp provided no evidence that any confidential or trade secret information was contained in the purportedly synced files. Moreover, Stefánsson testified that he has not accessed any documents related to these customers since he resigned, has not spoken to these customers, and has no plans to do so. *Id.* at 267:19-269:2. NetApp never disputed this or crossed him on these issues. To demonstrate a substantial likelihood of success on the merits, NetApp must do more than say that certain documents *possibly* synced by Stefánsson at some point *may* contain confidential or trade secret information about publicly known client relationships.

### C. NetApp's Other Evidence Shows Only That Stefánsson Was Unhappy at NetApp and Was Planning His Departure.

The remainder of NetApp's evidence confirms Stefánsson's version of events: he became unhappy at NetApp and, after talking to mentors, friends, and family about his future, he started a conversation with a prospective employer. There was nothing

---

[28] *See, e.g.*, https://www.netapp.com/partnerships/nfl/; https://www.netapp.com/blog/cloud-native-storage (including a quotation about NetApp from Chevron).
[29] *Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1411 n.25 (11th Cir. 1998).

improper about this. It is common in the industry (indeed, in any industry) to start interviewing for a new position before leaving your old one. Tr. at 218:18-21, 219:10-21, 231:24-232:8. Stefánsson was clear that there were no discussions of NetApp's confidential information or trade secrets in these conversations,[30] *id.* at 226:1-17, nor were any such discussions reflected in the personal text messages with the CEO of VAST extracted from his computer, *see* Pl. Exs. 28–37. And Stefánsson was not secretive about his intentions. He told his supervisor, Dallas Olson, that he was considering VAST. Tr. at 230:25-232:20. In fact, when Stefánsson ultimately decided to leave, Mr. Olson asked him if he was joining VAST.[31] *Id.* at 244:4-7.

In its opening statement, NetApp argued that conversations with VAST show that Stefánsson was discussing "how they could fashion … [Red Stapler] bringing the IP" to VAST. *Id.* at 23:6-14. It introduced no evidence to support this claim. There are no discussions whatsoever—not in any text message, Slack conversation, or Facebook chat—about taking NetApp confidential information to trade secrets to Red Stapler or to VAST. *See* Pl. Exs. 3, 9, 28–37. NetApp points to a text message between Stefánsson and Mr. Hallak about using a services agreement[32]—much like the one that the Greenqloud team entered with NetApp in 2017—in order to comply with the contractual non-compete obligations of some of the other Icelandic individuals. Pl.

[30] NetApp did not cross-examine Stefánsson on this subject.
[31] At the time of his departure, Stefánsson did not view Red Stapler's acquisition of VAST as certain, so he preferred say only that he was starting a new company. Tr. at 244:5-13; *see also* Pl. Ex. 28.
[32] A week after the hearing, even though it never sought to keep the hearing open, NetApp moved on an emergency basis (its sixth such motion) demanding that Stefánsson produce the services agreement, unredacted compensation information, and other materials. Judge Irick denied the motion in its entirety as procedurally improper and not compliant with the Local Rules. ECF No. 138.

Ex. 31. As Stefánsson explained, this discussion was about ensuring *compliance* with contractual obligations by some of the other Red Stapler team, not avoiding them. Tr. at 177:23-178:14. The parties agree that Stefánsson is not subject to a non-compete clause, *id.* at 12:24-25, 177:23-25, so these discussions had nothing to do with his obligations to NetApp.[33] And importantly, there is no discussion in these messages of avoiding the *confidentiality* obligations to NetApp that form the basis of NetApp's claims. It is plain from the face of the documents themselves that no one discussed NetApp's confidential information or purported trade secrets. Pl. Exs. 3, 9, 28–37.

NetApp also claims that Stefánsson was "double-employed" because he was working for both NetApp and Red Stapler during this period. *Id.* at 23:2-5. But throughout the time that Stefánsson worked at NetApp, Red Stapler was nothing more than an idea to start a new company with his longtime friends and cofounders. *Id.* at 233:8-235:1, 235:12-24. Stefánsson testified nothing was built or developed for Red Stapler until after Stefánsson left NetApp—testimony not challenged on cross-examination. *Id.* at 235:2-11, 237:1-8, 240:22-241:13, 243:8-21, 246:5-13. Red Stapler was not formed until July 2025, when it was registered in Iceland. *Id.* at 246:14-21.

## II. NetApp Failed to Demonstrate Irreparable Harm.

NetApp also failed to show irreparable harm. Even if the Court credits NetApp's speculation about the potential "syncing" or transfer of data and ignores

[33] NetApp also seeks to attribute jokes made by others in a Facebook message about mutual firings to Stefánsson. Tr. at 23:11-13. Putting aside that the conversation was plainly a joke among friends—no one fired anyone else; they all resigned after what they viewed as an unjustified termination of Eirikur Hrafnsson—Stefánsson was not involved in that part of the discussion. Pl. Ex. 3; *see also* 179:3-12.

NetApp's failure to identify any protectable trade secrets in that data or establish that Stefánsson used them, there is no evidence that this data is related to Stefánsson's current work. The unrebutted testimony shows that, since leaving NetApp, Stefánsson has worked on a marketplace offering incompatible with NetApp's first-party offering. *Id.* at 240:22-241:20. Moreover, NetApp presented no evidence showing that the purported damage it might suffer could not be redressed with monetary damages, a requirement for a showing of irreparable harm.[34] Here, the evidence shows that, "thousands" of companies have marketplace offerings, which hardly would harm NetApp's wholly unrelated first-party offering. Tr. at 60:18-61:7.

## III. The Proposed Injunction Is Overbroad and Unsupported by the Evidence.

NetApp has repeatedly said it seeks an injunction to compel Stefánsson to "obey the law." Tr. at 13:1-2, 26:13-18, 27:2-3. But as Judge Tjoflat observed recently, "[a]n 'obey-the-law' injunction is noxious," as "it is an injunction that orders a defendant to obey the law, rather than to abide by or refrain from a *precise and ascertainable mode of conduct*."[35] "An injunction must be framed so that those enjoined know exactly what conduct the court has prohibited and what steps they must take to conform their conduct to the law."[36] In a trade secrets case, the injunction must be grounded in the evidence presented and tailored to the specific trade secrets allegedly misappropriated,

[34] *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987).

[35] *United States Sec. Exch. Comm'n v. Spartan Securities Grp., Ltd.*, --- F.4th ---, 2026 WL 125790, at *58 (11th Cir. Jan. 16, 2026) (Tjoflat, J., dissenting) (emphasis added). Judge Irick, in denying NetApp's two most recent emergency discovery motions, raised this decision with NetApp given its repeated invocation of "obey the law" language. ECF No. 138 at 43:4-44:1.

[36] *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1222-23 (11th Cir. 2000); *see also* Fed. R. Civ. P. 65(d).

so the enjoined party is "on notice as to the types of information" to which it applies.[37]

NetApp has twice conceded that the injunction it seeks is overbroad. *See* ECF No. 41 at 5; Tr. at 27:1-21. But even NetApp's narrowed proposals are completely groundless. Without specificity regarding the purported trade secrets at issue,[38] the open-ended injunction NetApp proposes would leave substantial uncertainty as to the scope of the prohibited activity.[39] No injunction can issue at all based on what NetApp has offered, because a legally adequate injunction must be limited to specifically identified, concrete trade secret information.

Finally, though NetApp's Motion also sought injunctive relief relating to preservation of documents and non-solicitation of employees or business partners, NetApp offered no evidence that Stefánsson violated such an obligation, let alone that there is any risk of a future violation. An injunction on these bases is unsupportable.

**CONCLUSION**

For the foregoing reasons and those stated in Stefánsson's Opposition to the Motion (ECF No. 37), NetApp's Motion should be denied.

Dated: January 26, 2026

By: *<u>/s/ Ian M. Ross</u>*
Ian M. Ross
iross@sidley.com
Fla. Bar No. 091214
SIDLEY AUSTIN LLP
830 Brickell Plaza
Miami, Florida 33131
Telephone: (305) 391-5100

[37] *Red Cross*, 143 F.3d at 1412.
[38] Although NetApp has argued its concerns relate to a first-party offering, the evidence shows Stefánsson is not working on a first-party offering for VAST.
[39] *Red Cross*, 143 F.3d at 1412.

Jennifer M. Wheeler (*pro hac vice*)
jwheeler@sidley.com
Abigail Bachrach (*pro hac vice*)
abachrach@sidley.com
Patrick Musgrave(*pro hac vice*)
pmusgrave@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000

*Counsel for Defendant Jón Thorgrímur Stefánsson*

## CERTIFICATE OF SERVICE

I certify that on January 26, 2026, I electronically filed this document with the Clerk of the Court using CM/ECF, causing a copy to be served on counsel of record; a copy of this document was also e-mailed to counsel of record.

/s/ *Ian M. Ross*
Ian M. Ross