**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| NETAPP, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | **Case No. 6:25-cv-02130** |
| | § | |
| JÓN THORGRÍMUR STEFÁNSSON, | § | |
| | § | |
| *Defendant*. | | |

# PLAINTIFF'S CLOSING STATEMENT

## INTRODUCTION

This case is about a senior executive who covertly misappropriated NetApp's crown jewel cloud platform, publicly claimed credit for delivering that technology to a competitor, and—once exposed—tried to rewrite the story.

While serving as NetApp's Senior VP and Chief Technology Officer, Defendant Jón Stefánsson started the competing business "Red Stapler" as its controlling owner, Tr. 179:14-15 & Pl. Ex. 65, at 1, and misappropriated NetApp's ***cloud control plane and service delivery engine***, violating the Defend Trade Secret Act ("DTSA"), Florida Uniform Trade Secret Act ("FUTSA"), and his Proprietary Information, Inventions, and Non-Solicitation Agreement ("PIIA").

Within ten weeks of leaving NetApp, Stefánsson sold Red Stapler to NetApp's direct competitor, VAST Data. Upon acquiring Red Stapler, VAST publicly announced in September 2025 that it had acquired from Red Stapler "***[t]heir cloud control plane and service delivery platform*** [which] helps enterprises burst seamlessly into public cloud environments with confidence"—the very technology NetApp spent years and tens of millions of dollars developing. In response to press inquiries about whether Red Stapler offered IP or was merely an acqui-hire, Stefánsson rejected any suggestion of an acqui-hire identifying Red Stapler's "Polaris extensible service delivery platform IP." Tr. 196:17-23; 264:6-10.

These public admissions are fatal to Stefánsson's position. The technology VAST acquired was not generic. Stefánsson himself described it as "very unique"—the same technology that made NetApp "the first company in the world to deliver native,

first-party public cloud storage service[s]" across all three major hyperscalers: Amazon, Google, and Microsoft. Tr. 180:14-20; 181:7-11.

Faced with the impossibility of independently building a copycat product in ten weeks, Stefansson now changes his story. Stefánsson's entire defense rests on an extraordinary assertion: that the statements he and VAST made to the public were false. Stefánsson disavows VAST's official corporate announcement to investors and the market. He retreats from his own affirming, contemporaneous admissions. He now claims—implausibly and without any objective evidence—that Red Stapler had no technology[1] and that the acquisition was an acqui-hire.

The Court should reject Stefánsson's litigation-driven revisionism. Either Stefánsson and VAST misled the market and their investors, or Stefánsson has not been candid with this Court. The record makes clear it is the latter.

Despite the early procedural posture and the limited discovery available, the evidence presented at the hearing overwhelmingly supports VAST's and Stefánsson's original public statements that VAST obtained NetApp's IP:

- **Theft of NetApp Source Code.** Stefánsson's collaborator took NetApp's source code for the cloud control plane's "core logic." Tr. 87:10-17; 152:24-153:6; 154:3-18.
- **Theft of Company-Owned Intellectual Property.** While employed at NetApp, Stefánsson and his team used a Red Stapler GitHub repository containing cloud extensibility experiments, Kubernetes configurations, an architectural "skeleton," and "open-source application configurations"—

[1] This implausible claim is further contradicted by the July 1 Services Agreement, under which Red Stapler agreed to develop technology for VAST. Pl. Ex. 64, at 2.

which is code. Tr. 249:11; 251:8-12. NetApp owns anything created during their employment. PIIA § C.1.

- **Exfiltration of NetApp Confidential Information.** Stefánsson transferred to his personal iCloud account confidential and highly sensitive NetApp materials. Tr. 70:17-8; 148:5-20.

- **Efforts to Conceal Misconduct.** Stefánsson deleted materials he synced with his personal account; two of his employees wiped their entire computers; and the team kept key conversations off NetApp devices. Tr. 66:19-67:4; Tr. 72:7-74; Pl. Ex. 3, at 49.

Stefánsson's conduct was not accidental or benign. His choice of the name "Red Stapler" was not, as he claimed, prompted by some innocuous "office theme." Tr. 234:15-24. Nor were his Slack and Facebook messages "friendly banter." *Id.* 179:11. Those communications reflect anger, resentment, and an intent to harm NetApp—particularly after his "best friend and co-founder," Eiki was terminated. *Id.* 179:3–12. Stefánsson's conduct went well beyond misappropriation:

- **Employee Solicitation:** Stefánsson engaged in continued, coordinated, and sustained efforts to take NetApp employees to its competitor, introducing them to VAST's CEO, negotiating their salaries, and providing them financial support until the acquisition to enable resignations. Pl. Ex. 9.

- **High Risk of Partner Solicitation Violations:** As VAST's "General Manager of Cloud Solutions [sic] to lead the company's hyperscale cloud strategy," Stefánsson's role necessarily requires soliciting hyperscaler partners, in violation of his restrictive covenants. Pl. Ex. 4.

Absent Court intervention, NetApp faces imminent and irreparable harm: competing against its own stolen inventions. Based on the record available at the TRO stage, the Court already exercised its authority to grant preliminary injunctive relief and invited NetApp to move to convert the TRO into a preliminary injunction. NetApp now seeks precisely that relief.

## ARGUMENT

### . NetApp Has Shown a Likelihood of Success on the Merits of Its Trade Secret Misappropriation Claims.

"A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain,* success." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) (citation omitted) (emphasis in original); *see also University of Texas v. Camenisch*, 451 U.S. 390, 394 (1981) ("A party . . . is not required to prove his [or her] case in full at a preliminary injunction hearing[.]"). NetApp has met that burden.

A. NetApp Has Protectable Trade Secrets that Differentiate it from the Competition.

NetApp is "a leading provider of high-performance data management and cloud services." (Dkt. 1 ¶ 4; Dkt. 3-3 ¶¶ 6–9.). NetApp developed an award-winning cloud control plane and sophisticated service delivery engine that allows customers to manage their data from hyperscalers' native interfaces—crown-jewel technology central to NetApp's competitive advantage. Tr: 43:15-22; 138:25-139:21; 176:19-177:2. As NetApp explained in its Motion for Preliminary Injunction:

> NetApp possesses trade secrets related to its first-party cloud storage services, which NetApp developed to run natively on its hyperscaler Business Partner's platforms; its hyperscaler-agnostic cloud solutions, which allow customers to manage their data across multiple different public and private clouds; and its cloud control plane product, which allows end users to manage and operate all elements of the data estate, including storage capacity, movement, protection, and analysis of an organization's ever-expanding and increasingly dispersed data, from the hyperscaler's native interface.

Dkt. 15, at 13 (citing Dkt. 3-2 (Decl. of S. Kumar) ¶ 11). It took roughly four years of work by a large team of engineers and at least tens of millions of dollars to achieve NetApp's first-party offering with Microsoft. Tr. 49:2-12; 137:14-138:10. It took significant additional time and investment to be able to integrate with the other two major hyperscalers, Amazon and Google. Tr. 48:16-49:1; 138:11-139:3.

Stefánsson does not dispute these facts and admits he was "very proud" "that NetApp was the first company in the world to offer native first party public cloud storage service." Tr. 180:14-17; Dkt. 37. He was "exceptionally proud" that NetApp was "the first storage company in the world to embed their OS [operating system] into all three hyperscalers." Tr. 180:18-24. When asked if he "dispute[d] that NetApp's ability to embed their operating system into the public cloud—Amazon, Google, and Microsoft—was a transformational story," Stefánsson replied, "It's very unique." Tr. 181:8-11. Because NetApp's cloud control plane and service delivery engine are uniquely designed, the underlying trade secrets enable NetApp to maintain its leadership position and to derive substantial economic value. If a direct competitor were to access or use these trade secrets, it could replicate NetApp's offering in a dramatically accelerated timeframe—undercutting NetApp's market leadership and harming sales. Tr. 53:12-54:1; 54:20-55:4; 154:3-24.

B. NetApp Has Taken Reasonable Measures to Protect its Trade Secrets.

NetApp shows in its Motion for Preliminary Injunction, and Stefánsson's Response does not dispute, Dkt. 37, that NetApp took reasonable measures to protect its trade secrets, Dkt. 15, at 13. NetApp's Chief Information & Security Officer—who

adopted his declaration (Pl. Ex. 52) and the contents thereof on the stand—testified that NetApp's security procedures protect NetApp's cloud control plane, service delivery engine, first-party cloud storage services and partnerships, and hyperscaler integration services. Tr. 167:10-168:15.

C. Stefansson Had Broad Access to NetApp's Valuable Trade Secrets.

Stefánsson testified he was "very important" to the "cloud engineering and pivotal business development projects with major public clouds, Amazon, Google, and Microsoft." Tr. 182:23-183:1. He spent eight years in roles giving him broad access to NetApp's sensitive information, technical roadmaps, and hyperscaler relationships. Dkt. 3-3, at 1-2. He admitted he had access to NetApp's trade secrets, source code, engineering documents, and sales information. Tr. 175:5-12.

D. NetApp Presented Ample Evidence of Misappropriation.

The record satisfies DTSA/FUTSA under both direct and circumstantial proof of actual or threatened misappropriation. Courts accept circumstantial evidence to infer misappropriation, especially where the defendant had deep exposure and the competing solution appeared at improbable speed. *See, e.g., Mapei Corp. v. J.M. Field Mktg., Inc.*, 295 So. 3d 1193, 1199 (Fla. Dist. Ct. App. 2020).

The circumstantial evidence here is undeniable and permits this Court to infer misappropriation. *Cf. Priority Payment Sys., LLC v. Signapay, LTD*, 161 F. Supp. 3d 1294, 1302 (N.D. Ga. 2016). There is no dispute that Stefánsson had knowledge of NetApp's trade secrets, and there is ample evidence that the product VAST announced is substantially similar to NetApp's cloud control plane. Tr. 54:2-22; 143:1-9. Courts

infer use where a former insider with access produces a strikingly similar competing product on the heels of departure. *MicroLumen, Inc. v. Allegrati*, 2007 WL 9757950, at *11 (M.D. Fla. Aug. 31, 2007) ("[I]t defies common sense that Allegrati does not use the information he learned at MicroLumen in his new business."). Here, the record reflects suspicious exfiltration near the time of departure—beyond prior, routine business activity—supporting a reasonable inference that the company's confidential information was used without consent. Pl. Ex. 3; Tr. 86:14-87:21; 68:15-69:17. *MicroLumen*, 2007 WL 9757950, at *11 ("[H]e took this information with him, both literally and figuratively, to start up his new company."); *Priority Payment*, 161 F. Supp. 3d at 1302 ("There is no direct evidence at this juncture whether Simone ultimately used the VIMAS source code in developing the software for SignaPay, though the evidence of the transfer [to his personal email account] and timing suggests this.").

According to VAST's and Stefansson's public statements, he built a copycat product to be sold to a NetApp's competitor in ten weeks. Courts recognize that an implausibly fast timeline and close similarity—particularly following the movement of key personnel—are powerful circumstantial indicators of misappropriation warranting preliminary relief. *See MicroLumen*, 2007 WL 9757950, at *11 ("I find the evidence to reveal that he was granted a 'head start' in developing his own business because of his work with MicroLumen.").[2] The implausible development timeline

[2] "Lynch also testifies that certain aspects of MicroLumen's processes were not public knowledge, . . . and that the learning curve for a person with knowledge of MicroLumen's processes would require only six months to a year in order to produce larger tubing, whereas even a degreed engineer or other

here, coincident with the influx of former NetApp personnel, reasonably implies VAST is working on a product derived, at least in part, from NetApp's trade secrets.

But there is much more. NetApp has presented direct evidence of Stefánsson's misappropriation of its trade secrets, which Stefánsson has failed to rebut with credible evidence that he would ordinarily be expected to possess.

1. Stefánsson sold NetApp's proprietary cloud control plane technology to VAST.

The conclusion that Stefánsson sold VAST NetApp's "cloud control plane and service delivery platform," *see supra* Intro., is unavoidable given Stefánsson's team's exfiltration of NetApp's cloud control plane source code. As he left NetApp to join Stefánsson, Grímur "Gimmi" Jónsson—Stefánsson's co-owners in Red Stapler, close friend of thirty years, and a "Key Employee"[3]—copied "the vast majority of his user profile" to an external hard drive on May 24 and 25, 2025. Pl. Ex. 12; Tr. 80:5-81:22; 86:14-88:24; 130:22-131:9; 180:2-13. The Gimmim2home zip file alone contained nearly 300,000 files or 13 gigabytes of data, Tr. 116:2-117:7, including a NetApp subfolder with "NetApp/src paths" and "Cloud Volumes" content—containing NetApp's ***highly confidential source code and configurations***. Tr. 87:10-17; 152:24-153:6. NetApp's VP of Engineering testified that the NetApp directories Jónsson copied contained the "***core logic" of NetApp's IP developed***

intelligent individual with mechanical and mathematical aptitude would require a longer learning curve, roughly two to three years, to develop an economical process for producing polyimide tubing using only information in the public domain without knowledge of MicroLumen's confidential processes and techniques." *MicroLumen*, 2007 WL 9757950, at *8.

[3] *See infra* at II.B, discussing Stefánsson's Key Employees spreadsheet, which compiles sensitive information related to the employment and compensation of Stefánsson's cohorts.

***specifically for its cloud control plane***, which he described as "a brain, which is like integrating ONTAP operating system over the hyperscalers." Tr. 154:3-18.

The forensic investigation also showed the devices of two other "Key Employees" Stefánsson solicited to join Red Stapler and later VAST—Eiki Hrafnsson and Tryggvi Larusson (Tr. 76:8-17)—were "reset to factory settings," such that the forensic investigators "could not get any information" from those devices. Tr. 66:19-67:4. Stefánsson's cohorts worked in concert to exfiltrate data and conceal wrongdoing. Because Stefánsson must have known that any cloud control plane delivered to VAST was improperly obtained (if not by Stefánsson himself then by Stefánsson's "Key Employees"), the improper conduct of Jónsson, Hrafnsson, and Larusson provides strong circumstantial evidence of misappropriation by Stefánsson. *See* 18 U.S.C. § 1839(5)(A) (misappropriation means "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"); *cf. Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1294–95 (M.D. Fla. 2018) ("A claim for misappropriation may exist . . . where the defendant is alleged to have obtained the trade secrets while knowing that they were acquired by improper means." (citing 18 U.S.C. § 1839(5)(A))).

Stefánsson and his team's exfiltration explains how VAST was able to confidently claim in their September 2025 press release possession of NetApp's IP. *See supra* Intro. That press release was corroborated by Stefánsson's response to press disclaiming any acqui-hire and directing the press to Red Stapler's "Polaris

extensi[ble] service delivery platform IP," Tr. 196:17-23; 264:6-10, explaining that "Red Stapler brings capabilities of automating and simplifying deployment of the VAST AI ***OS [Operating System],*** the complete cloud lifecycle management, simplifying the integrations with ***native cloud*** AI services." Tr. 197:25-198:7 (emphases added). It was also corroborated by Stefánsson's public LinkedIn post:

> We founded Red Stapler with the vision ***to leverage our expertise and deliver services for public clouds*** on-premises and managed service providers over the past couple of decades. Recognizing the need for a highly extensible and pluggable service delivery platform, ***we set out to develop one that truly addresses the challenges faced by companies seeking to transform their products into fully managed services***. ***This platform*** boasts extensive integrations, scalability, and pluggability essential for delivering a true SaaS experience regardless of the chosen deployment location.

Tr. 199:12-200:2 (quoting Pl. Ex. 10 (emphases added)); *see also Fujikura Composite Am., Inc. v. Dee*, 2024 WL 3261214, at *9 (S.D. Cal. June 28, 2024) (a defendant's "pre-litigation, public-facing testimony is entitled to greater weight than his post-litigation, self-serving testimony").

NetApp's VP of Product Marketing, Jeff Baxter, testified that the statement in VAST's press release that Red Stapler's "cloud control plane and service delivery platform helps enterprises burst seamlessly into public cloud environments with confidence" was "concerning" because "that sounds very much like the technology we have," including the fact that "cloud control plane" is "the exact same terminology, the exact same word," and that "service delivery platform" sounds "very similar to 'service delivery engine.' But more importantly, *regardless of the names, those are the*

*capabilities that those allow. They allow enterprises to burst into public cloud environments. They allow them to be hyperscale.*" Tr. 54:11-19 (emphasis added).

We know now that Stefánsson and his cohorts at Red Stapler did not legitimately develop from scratch in just ten weeks the cloud control plane and service delivery platform that took NetApp "four years and tens to hundreds of engineers, tens of millions of dollars of R&D" to build. Tr. 54:20-55:4; *see also* Tr. 155:16-25. *See MicroLumen*, 2007 WL 9757950, at *8. Instead, the source code exfiltration and other evidence shows they lifted it from NetApp.

2. Stefánsson exfiltrated NetApp's confidential and strategically sensitive documents to his personal iCloud account and engaged in suspicious deletion activity.

In addition to the source code, Stefánsson exfiltrated data by synching confidential NetApp documents to his personal iCloud account, including at least two documents stamped "Confidential" or "NetApp Confidential." Tr. 71:11-72:2. Equally if not more concerning, Stefánsson uploaded hundreds of screenshots from his NetApp-issued laptop to his personal iCloud. Tr. 71:5-10. Stefánsson's connection of his personal iCloud account to his NetApp computer violated NetApp's "Data Security Policy," Tr. 280:11-281:11, which exists to prevent the conduct here—the unauthorized removal of NetApp trade secrets to personal accounts or devices.

NetApp's Sanjay Kumar testified to the highly sensitive nature of certain documents Stefánsson synched. Tr. 144:5-10; 144:12-145:12. For example, the "PCS" in the Oct 19, 2021, PCS 3 Year Plan stands for NetApp's "public cloud services," which relates to the hyperscalers and typically contains NetApp's "roadmap" and product

visions for the next three years. Tr. 148:5-20. These files have "planned improvements or trend line for the product" and "some of these features [NetApp was] going to implement" at some point. Tr. 149:2-8. It also included documents about two of NetApp's key strategic customers, Chevron[4] and the NFL. Tr. 56:19-58:10; 70:17-71:3; 144:23-24. Stefánsson also suspiciously deleted seven Google Chrome profiles before returning his work laptop, preventing NetApp from being able to investigate whether he exfiltrated other documents and data to other personal storage clouds or personal email accounts aside from his iCloud. Tr. 72:3-20.

Stefánsson also placed 722 documents in the trash folder on his work device, beginning on April 26, 2025. Tr. 69:8-12. The vast majority, 682 files, were trashed June 12, 2025, the date of Stefánsson's resignation letter. Tr. 69:13-17. Notably, Section B of the PIIA states: "I agree that I will not copy, delete, or modify any Company Documents and Materials of the Company or any work product I generated within the scope of my employment at the Company upon the termination of my employment (or notice thereof)." This evidence that Stefánsson exfiltrated confidential and sensitive NetApp documents to his iCloud and engaged in deletion activity that would prevent NetApp from discovering additional exfiltration activity shows a substantial likelihood that NetApp will succeed as to misappropriation.

[4] NetApp's VP of Product Marketing testified that Stefánsson was the Executive Sponsor for Chevron, "which is a senior executive that's chosen to watch over that account, offer any guidance, deeply understand and be involved in the strategic planning at NetApp around that account, and otherwise act as a liaison and coordination point for all of our interaction with them." Tr. 57:9-19.

3. Stefánsson and his team used Red Stapler GitHub repositories to develop technology for VAST using NetApp's IP.

It is undisputed that Stefánsson's team, while working for NetApp and before they all joined Red Stapler and later VAST, formed and operated the GitHub (a platform storing, modifying, collaborating, and sharing source code, Tr. 90:19-25) organization "redstapler-is," Pl.'s Ex. 2; Tr. 92:23-24; 140:21-141:4; 248:4-10, receiving invitations from, and emails related to, the repository on their NetApp work emails. Pl. Ex. 2, at 3; Pl. Ex. 41. These GitHub emails demonstrate the development of an active source code repository during and immediately after his cohort's NetApp employment. Tr. 94:22-95:16. Stefánsson himself conceded that the Red Stapler GitHub organization contained, among other things, at least experiments, "research on extensibility of different clouds" (Tr. 249:11), and "somewhat of a design, . . . Kubernetes configurations. . . . the skeleton" (Tr. 251:8-12), and "open-source application configurations" (Dkt. 37-1, at 4). At a minimum, NetApp owns whatever was created while Stefansson and his team were at NetApp.

4. Stefánsson's failure to offer credible evidence in his possession is fatal to his defense.

Faced with his contemporaneous admissions that the Red Stapler acquisition was not an acqui-hire and that Red Stapler brought core IP—indeed NetApp's IP—to VAST, all Stefánsson could offer was a revisionist, litigation-motivated story and blanket denials. Rather than produce evidence within his control to substantiate his innocence, Stefánsson (i) refused to turn over materials from the Red Stapler repository in his and likely his counsel's possession, Tr. 255:4-22; Dkt. 52, 134, asking

this Court to rely solely on his "memory," Tr. 251:22; 252:16-20; 254:11-14, and (ii) invites this Court to infer an acqui-hire based on the dollar amount in a single document while withholding evidence regarding the VAST stock or other compensation he received, Tr. 175:4-12, and other acquisition and hiring documents—including a "Services Agreement by and between [Red Stapler] and [Vast Data Ltd.], dated July 1, 2025, in connection with which **[Red Stapler] developed certain technology for the benefit of [Vast Data Ltd.]**" (the "Services Agreement"). Pl. Ex. 64, at 2 (emphasis added).[5] Furthermore, Stefansson's misconduct reflected his mounting anger, resentment, and an intent to harm NetApp, particularly after the termination of his "best friend and co-founder," Eiki. Tr. 179:1-12. He was motivated by factors that also extend beyond financial incentives.

When a party opposing interim relief fails to offer credible evidence rebutting the movant's claims—or evidence that the opposing party would ordinarily be expected to possess—a court may treat the movant's showing of misappropriation as established for purposes of determining interim relief. Courts have applied this principle where defendants provide only bare denials or no meaningful evidence in response to substantial, specific evidence of misappropriation. *See*, *e.g.*, *AtriCure, Inc. v. Meng*, 842 F. App'x 974 (6th Cir. 2021); *Inventus Power, Inc. v. Shenzhen Ace Battery Co., Ltd.*, 2020 WL 3960451, at *14 (N.D. Ill. July 13, 2020).

[5] In a filing dated January 22, 2026, Stefánsson represented that he "is willing to provide the Services Agreement and an unredacted copy of his Employment Agreement with VAST (subject to confidentiality)." NetApp's counsel sent an email to Stefánsson's counsel at 10:54 PM EST asking when NetApp could expect production of those documents. *See* Ex. A, attached hereto. As of the time of this filing, NetApp has not received the documents or a response to the above email.

## I. NetApp Has Shown a Substantial Likelihood of Success on the Merits on Its Claims for Breach of Restrictive Covenants.[6]

### A. Stefánsson Breached Section B of the PIIA by Misappropriating and Disclosing NetApp's Proprietary Information.

In signing the PIIA, Stefánsson agreed NetApp owns all commercially valuable information "developed, conceived, created, or discovered by or on behalf of [NetApp]" or "conveyed or made known to [NetApp]." Pl. Ex. 1, §§ B, A.7. Stefánsson was required to assign all proprietary information and related intellectual property to NetApp for the duration of Stefánsson's employment. Pl. Ex. 1, § B. Furthermore, Stefánsson pledged to not impermissibly use or disclose NetApp proprietary information during or after his employment. *Id.* The same evidence establishing that Stefánsson violated FUTSA and DTSA (*supra* II.A-B) establishes that Stefánsson breached PIIA § B.

### B. Stefánsson Breached the PIIA by Soliciting or Inducing NetApp Employees to Render Services for the Benefit of Red Stapler and VAST and to Terminate Their Employment with NetApp.

The evidence shows Stefánsson engaged in coordinated and sustained efforts to take "Key" NetApp employees to VAST. *See generally* Pl. Exs. 3, 9, & 33; Tr. 155:9-15 (detailing the timeline of these "Key" employee departures, including one in August

[6] In its motion for preliminary injunction, NetApp demonstrated that the PIIA is a valid and enforceable contract and that the restrictive covenants are reasonably necessary to protect NetApp's legitimate business interests. Dkt. 15, at 7-9. Stefánsson did not dispute these points in his Response (Dkt. 37) and thus has forfeited any argument as to the enforceability of any provisions of the PIIA. *See Ajomale v. Quicken Loans, Inc.*, 860 F. App'x 670, 671 (11th Cir. 2021) (holding that the failure to adequately brief a claim abandons the claim).

2025 **after** Stefánsson's resignation).[7] In so doing, he violated the PIIA by directly or indirectly soliciting or inducing NetApp employees for one year post-employment and/or providing employee proprietary information to third parties. Pl. Ex. 1, § H.[8] Stefánsson also violated the PIIA by engaging in "contacts, acts, or communications" that directly or indirectly "cause or induce, attempt to cause or induce, or can be reasonably expected to cause or induce" NetApp employees to work for the benefit of another person or entity or terminate employment with NetApp. *Id.*, § A.8.

Specifically, Stefánsson began communicating with VAST's CEO Renen Hallak about joining VAST in April 2025, Tr. 225:13-226:7; *see also* Tr. 75:13-16; Pl. Ex. 9, at 3–4, while compiling information including position, salary and equity compensation for several "Key Employees" Stefánsson brought to VAST. Tr. 75:17-78:6; 76:24-25. He kept these select NetApp employees apprised of his ongoing negotiations with VAST, including the terms of the draft employment agreement. Pl. Ex. 3, at 18, 49 (noting where the draft diverged from the terms Stefánsson previously "discussed

[7] Based on this evidence, the court can infer Stefánsson breached his non-solicitation obligations. *See Home Point Fin. Corp. v. Lane*, 2022 WL 22866392, at *4 (M.D. Fla. 2022) (direct evidence of solicitation coupled with a mass resignation supported a non-solicitation breach finding).

[8] Stefánsson's argument that his obligation not to solicit other NetApp employees began only after his employment terminated is not credible. Dkt. 37, at 14-15. Section H of the PIIA sets an end date to the restriction (as required by law), but the notion that Stefánsson would be subject to greater restrictions after his termination than during the term of his employment is absurd. Indeed, the provision itself clarifies that the "restriction shall also not apply to communications with employees of the Company as party of [Stefánsson's] performance of duties for the Company (such as bona fide hiring and firing decisions affecting Company personnel)." Stefánsson's proposed interpretation of this provision to apply only post-termination would render this language meaningless, which is contrary to "a cardinal principle of contract interpretation" under Florida law. *Super Cars of Miami, LLC v. Webster*, 300 So. 3d 752, 755 (Fla. 3d DCA 2020). Moreover, in Section F of the PIIA, Stefánsson acknowledged his duty of loyalty to NetApp, which under Florida law "is violated by soliciting other employees before the end of employment." *Seacoast Banking Corp. of Fla. v. Diemer*, 2020 WL 13031450 (M.D. Fla. June 29, 2020).

with Renen [VAST's CEO]."). And a May 1, 2025, iMessage thread with Stefánsson indicated that Renen (and VAST) were in the process of "interviewing his [Stefánsson's] crew." Pl. Ex. 33. In a Facebook chat, Stefánsson facilitated the adaptation of NetApp's staff contracts to create a new template for Red Stapler's sole benefit and the sequencing of the group's NetApp resignations. Ex. 33, at 37–42. At one point, he specifically asked whether the NetApp exemplar still "ha[d] any NetApp references" to which Eric Hrafnsson responded, "No, I updated it thoroughly, step by step." *Id.* at 42.

Then on May 20, 2025, Stefánsson offered these employees supplemental financial support to bridge the pay gap during their transition from Red Stapler to VAST to enable their early departure from NetApp. Pl. Ex. 3, at 26 ("And if any of us has a hard time being without pay for 3 months, I shall cover it for the time being."); *id.* at 43 ("[I]f I understand @Jónsa [Stefánsson] correctly, we are taking care of what Vast would take on after the purchase [of Red Stapler]."). And Stefánsson worked hard to conceal his bad acts. *See* Tr. 72:7-74:7 (Stefánsson's deletion of his Google Chrome profiles prevented investigation into the full extent of his data exfiltration activities); Pl. Ex. 3, at 49 (warning from Hrafnsson in the Red Stapler Facebook chat on May 27, 2025, to not "download to NetApp computers," to which Stefánsson replied: "Exactly").

NetApp is entitled to the inference that Stefánsson's solicitation efforts directly and/or indirectly caused the departure of then-NetApp employees in violation of the PIIA. His efforts went beyond the act of solicitation and continued until they formally

joined VAST at least through financial support. *Cont'l Grp., Inc. v. KW Prop. Mgmt., LLC*, 622 F. Supp. 2d 1357, 1376 (S.D. Fla. 2009) (finding that defendant's forwarding of employees' resumes to a prospective employer showed a substantial likelihood of success of claim for breach of non-solicitation agreement, even if defendant never initiated contact with the other employees).

C. <u>NetApp Is Likely to Succeed on Its Claim for Breach of the Non-Solicitation of Business Partners Provision of the PIIA.</u>

The PIIA prohibits Stefánsson from soliciting or inducing Business Partners (including hyperscalers) to alter their relationships to NetApp's detriment; this prohibition is limited to Partners with whom Stefánsson had material contact or proprietary information within two years of his departure from NetApp. PIIA § G. The record confirms Stefánsson had a direct role in developing hyperscaler programs while at NetApp, and that he was "very important" to NetApp's "cloud engineering and pivotal business development projects with major public clouds, Amazon, Google, and Microsoft." Tr. 142:11-143:6; 182:23-183:1. As VAST's "General Manager of Cloud Solutions to lead the company's hyperscale cloud strategy," Stefánsson inevitably must directly or indirectly solicit NetApp's hyperscaler partners: Google, Microsoft and Amazon. Tr. 43:10-14 (Baxter explaining that there are only three generally accepted "hyperscalers"). VAST is benefitting from the very activity Stefánsson is prohibited from engaging in. *See* Pl. Ex. 4, at 2 ("With Jonsi [Stefánsson] and team joining VAST, we gain proven expertise in working hand-in-hand with hyperscalers to

deliver services that meet the demands of AI at global scale[.]”). Stefánsson has not disputed any of this. *See* Tr. 198:24-199:5; 199:12-200:2.

D. <u>NetApp Is Likely to Succeed on the Merits of Its Claim that Stefánsson Breached the “Disclosure and Assignment of Inventions” Provision of the PIIA.</u>

The PIIA assigns to NetApp all “Company Inventions” conceived, developed, or reduced to practice during employment (PIIA § C.1), and requires written disclosure of “Inventions” conceived or developed within six months post-employment (PIIA § C.2). Stefánsson concedes that any Company Inventions he developed while he and his Red Stapler team were still at NetApp belong to NetApp. Tr. 191:12-15. NetApp is likely to prove in discovery that *at least* the following items are NetApp’s Company Inventions that Stefánsson improperly used and disclosed to third parties: (i) the “Polaris extensive delivery service platform IP” (Tr. 196:17-23; 264:6-10); (ii) the contents of the “redstapler-is” GitHub repositories discussed *supra* at I.B.3; (iii) any technology Red Stapler developed for VAST pursuant to the Services Agreement (Pl. Ex. 64, at 2); (iv) and any other technology underlying the “cloud control plane and service delivery platform” VAST announced it had acquired from Red Stapler (Pl. Ex. 64, at 2). *See also* PIIA § B (agreement not to “use or disclose any Proprietary Information,” which is defined in PIIA § A.7 to include Company Inventions).

Stefánsson does not dispute that he was contractually required to disclose to NetApp any IP he developed up to six months after leaving NetApp (Tr. 191:16-20), but he admitted he did *not* disclose any IP to NetApp (Tr. 191:21-23). In light of these facts, NetApp is likely to succeed on its claim that Stefánsson breached PIIA § C.

## II. NetApp Has Demonstrated Irreparable Harm.

"[I]rreparable harm is presumed when a party appropriates or intends to appropriate trade secrets for its own use or the use of another unauthorized party." *Confianca Moving, Inc. v. De Oliveir*a, 2011 WL 13269500, at *6 (S.D. Fla. Jan. 24, 2011). The PIIA states that breach of restrictive covenants would cause NetApp "irreparable and continuing damage for which money damages are insufficient," Pl. Ex. 1, §Q, and, "[u]nder Florida law, 'the violation of an enforceable restrictive covenant [also] creates a presumption of irreparable injury.'" *Home Point Fin. Corp. v. Lane*, 2022 WL 22866392, at *5 (M.D. Fla. Dec. 14, 2022) (quoting Fla. Stat. § 542.335(1)(j)). Stefánsson cannot overcome these presumptions.

Indeed, courts recognize the difficulties in calculating harm caused by a departing executive who goes to a competitor. *See, e.g.*, *Johnson Controls, Inc. v. Rumore*, 2008 WL 203575, at *13 (M.D. Fla. Jan. 23, 2008) ("[T]he measure of [] damages in monetary terms due to the loss of key employees who suddenly began working for a competitor . . . is not easily quantifiable in monetary terms nor is the loss of competitive advantage experienced when a former key employee, possessed of proprietary or confidential information, begins using such knowledge in bidding against it."). This is such a case. Stefánsson took NetApp's trade secrets to a ***direct competitor*** (VAST) to accelerate VAST's timeline for building a ***substantially similar*** (identical) product to compete with NetApp with NetApp's ***own business partners***—Google, Microsoft and Amazon. Tr. 43:6-22; 54:2-22. NetApp's VP of Product Marketing testified that it requires "a significant amount of development and

IP to develop things like the service delivery engine and the cloud control plane" necessary to "deliver those differentiated, large-scale services." Tr. 53:13-15. He was particularly concerned that "if Mr. Stefánsson brought specific internal knowledge or IP about how we were able to achieve that and was able to put that to work for VAST Data," it would allow VAST "to more rapidly accelerate than normal to offer a native first party cloud storage services abrogating the years' worth of effort and significant expense we had had to put in to do that." Tr. 53:19-54:1.

As in *VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1363 (S.D. Fla. 2012), when "information [the defendant] purportedly has in his possession was disseminated to [the plaintiff's] ***competitors***, . . . [the plaintiff] would unquestionably suffer irreparable harm." *VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1363 (S.D. Fla. 2012) (emphasis added). Once NetApp's cloud control plane and service delivery engine know-how and partner strategies are used by Stefánsson to accelerate VAST's product offerings, the resulting secrecy loss and competitive head start cannot be undone or compensated with money damages. "[T]he loss of competitive advantage experienced when a former key employee, possessed of proprietary or confidential information, begins using such knowledge in bidding against it" is "not easily quantifiable in monetary terms." *Johnson Controls, Inc.*, 2008 WL 203575, at *13.

While Stefánsson insists he has no need at VAST for any Level 5 NetApp IP, Tr. 239:22-240:21, "the sheer fact of his employment with a direct competitor, in a similar position selling overlapping products in overlapping markets, 'endanger[s] the

information that he received at'" NetApp. *Veterinary Orthopedic Implants, Inc. v. Haas*, 2020 WL 5369087, at *15 (M.D. Fla. Sept. 8, 2020) (citation omitted). "And once" NetApp's "confidential business information is revealed, this harm cannot be undone." *Id.*

"[C]ourts have [also] routinely held that a defendant's use of proprietary information to solicit customers and clients to a direct competitor of the plaintiff"—as Stefánsson did here, *see supra* at II.D—"risks irreparable loss of customers and business, goodwill, and market position and competitiveness." *Anchor Title & Escrow, LLC v. Omega Nat'l Title Agency, LLC,* 2023 WL 3564942, at *2 (N.D. Fla. Apr. 14, 2023) (collecting cases).

## III. The Balance of Harms Weighs Toward NetApp.

The balance of equities is readily established in favor of NetApp. Courts routinely find the balance of harms weighs in favor of companies seeking to enjoin misappropriation of trade secrets, *see, e.g.*, *Hayes Healthcare Servs., LLC v. Meacham*, 2019 WL 2637053, at *5 (S.D. Fla. Feb. 1, 2019), and breach of non-solicitation and non-disclosure agreements, *see, e.g.*, *Foundever Operating Corp. v. Hahn*, 2023 WL 7496150, at *18 (M.D. Fla. Nov. 13, 2023).

Here, the harm to NetApp should a preliminary injunction not issue is extraordinary. NetApp paid $51 million to acquire Greenqloud (Tr. 49:11-12; 212:17-19), and then "it took roughly four years of work by a large team of engineers—tens or even hundreds of engineers—[and] definitely tens of millions or more of investment

. . . to build th[e] IP" that allowed NetApp to integrate with its "first cloud vendor" (*id.* 49:5-9). All that investment is at risk.

Stefánsson agrees "it's not a burden" for him to comply with the PIIA. Tr. 278:9. Asked why he does not want an injunction, he only referenced alleged harm to his reputation every defendant theoretically faces. Any hardship to Stefánsson from refraining from trade secret misappropriation and honoring his contract is nil to minimal, self-inflicted, and far outweighed by NetApp's legitimate interests.

## IV. The Public Interest Favors Protection of Trade Secrets and Enforcement of Restrictive Covenants.

The public interest is served by granting an injunction which would protect NetApp's investment in its trade secrets. Tr. 49:5–12. Florida places strong emphasis on protecting trade secrets. *Aquent LLC v. Stapleton*, 2014 WL 117095, at *3 (M.D. Fla. Jan. 13, 2014). Federal policy comports: The DTSA was enacted in part to combat foreign misappropriation of U.S. trade secrets—a concern implicated here, as Stefánsson is an Icelandic citizen who moved abroad to work for a foreign company. *Motorola Solutions, Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458, 481–83 (7th Cir. 2024); Tr. 22:21-23:4.

An injunction would also uphold and promote the integrity of binding contracts under Florida law. *See 7-Eleven, Inc. v. Kapoor Bros. Inc.*, 977 F. Supp. 2d 1211, 1230 (M.D. Fla. 2013) ("A preliminary injunction enforcing the restrictive covenants will serve the public interest, because enforcement of a valid restrictive covenant encourages parties to adhere to contractual obligations.").

## V. The Requested Relief is Narrowly Tailored and Lawful.

In his reply brief, Stefánsson objects to certain aspects of NetApp's proposed injunctive relief, Dkt. 37, at 19-20, all of which are fully addressed in NetApp's current proposed order attached as Exhibit A. NetApp has used the shorthand "obey-the-law injunction" merely to indicate that it seeks nothing beyond preventing Stefánsson from: (1) misappropriating NetApp's proprietary information and trade secrets; and (2) violating the PIIA by soliciting NetApp's partners or employees. Tr. 27:1–28:21.

NetApp's proposed injunction, however, is categorically different—in both kind and scope—from the overbroad "obey-the-law" injunctions rejected by the Eleventh Circuit, which prohibit conduct by reference to broad statutory commands. *See*, *e.g*., *Elend v. Basham*, 471 F.3d 1199, 1210 (11th Cir. 2006) (rejecting injunction requiring the Secret Service to "ensure there's no violation of the First Amendment"); *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1531 (11th Cir. 1996) (rejecting injunction prohibiting stormwater discharge "if such discharge would be in violation of the Clean Water Act"). Here, unlike in those cases, NetApp seeks a specific, narrowly tailored order grounded in the factual record and Stefánsson's contractual and statutory obligations. "The fact that compliance with an injunction would also result in compliance with the law is no barrier to its issuance." *Noble v. Tooley*, 125 F. Supp. 2d 481, 486 (M.D. Fla. 2000). Moreover, courts routinely grant injunctions in cases involving trade-secret misappropriation, *see, e.g., Advice Interactive Grp., LLC v. Web.com Grp., Inc.*, 734 Fed. App'x 712, 714-15 (11th Cir. 2018) ("[W]e will not apply Rule 65(d) rigidly, and we determine the propriety of an injunctive order by inquiring

whether the parties subject thereto understand their obligations under the order."), and breaches of restrictive covenants, *see, e.g.*, *Mohr v. Bank of N.Y. Mellon Corp.*, 393 Fed. App'x 639, 645-46 (11th Cir. 2010).

## CONCLUSION

The Court should enter a tailored preliminary injunction to preserve the status quo pending final adjudication.

Dated: January 26, 2026

Respectfully submitted,

/s/ Katherine Vidal
Katherine Vidal
California Bar No. 194971
KVidal@winston.com
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, D.C. 20036-3506
Tel.: (202) 282-5000
Fax: (202) 282-5100
WINSTON & STRAWN LLP
255 Shoreline Drive, Suite 520
Redwood City, California 94065
Tel.: (650) 858-6500
Fax: (650) 858-6550

Brett Johnson
Texas Bar No. 00790975
mbjohnson@winston.com
Chase J. Cooper
Texas Bar No. 24087342
CCooper@winston.com
Jenny Moroney Iorio
Texas Bar No. 24138582
JIorio@winston.com
Matthew J. Wurst
MWurst@winston.com
Texas Bar No. 24137303
Thanh D. Nguyen
Texas Bar No. 24126931
tdnguyen@winston.com
WINSTON & STRAWN LLP

2121 North Pearl Street, Suite 900
Dallas, Texas 75201
Tel.: (214) 453-6500
Fax: (214) 453-6400

*(Admitted pro hac vice)*

Nathan M. Berman
FBN: 0329230
nberman@zuckerman.com
Zuckerman Spaeder LLP
101 E. Kennedy Blvd., Suite 1200
Tampa, Florida 33602
Tel.: 813-221-1010
813-223-7961

*Attorneys for Plaintiff NetApp, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on January 26, 2026, I electronically filed the foregoing document, that it is available for viewing and downloading from the Court's CM/ECF system, that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/ *Katherine Vidal*
Katherine Vidal