UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

NETAPP INC.,

     Plaintiff,

v.                                                                  Case No: 6:25-cv-2130-JSS-DCI

JON THORGRIMUR STEFÁNSSON,

     Defendant.
_____/

### **ORDER**

Plaintiff, NetApp Inc. (NetApp), sues Defendant, Jon Thorgrimur Stefánsson, for breach of contract and for violations of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, and the Florida Uniform Trade Secrets Act (FUTSA), Fla. Stat. §§ 688.001–009, alleging that Stefánsson misappropriated NetApp's confidential and proprietary information, including trade secrets. (Dkt. 1.) Stefánsson moves to dismiss the complaint for lack of personal jurisdiction and forum non conveniens. (Dkt. 36; *see* Dkt. 81.) NetApp opposes the motion. (Dkt. 66.) Upon consideration, for the reasons outlined below, the court grants the motion.

### **BACKGROUND**

According to the unverified complaint, NetApp is "a leading provider of high-performance data management and cloud services." (Dkt. 1 ¶ 4 (footnote omitted); *see* Dkt. 3-2 ¶¶ 3–8.) It has "invested years of engineering effort and substantial resources to . . . address[] one of the most complex challenges in modern [information

technology ("IT")]: managing the ever-growing volume[] of data dispersed across multiple locations, both on[ ]premises and in the cloud." (Dkt. 1 ¶ 23; Dkt. 3-2 ¶ 9.) NetApp's investments resulted in the creation of its service delivery engine, which allows users "to manage and operate all elements of the[ir] data estate, including storage capacity, movement, protection, and analysis of [their] ever-expanding and increasingly dispersed data, from the hyperscaler's[1] native interface." (Dkt. 1 ¶ 23; *see* Dkt. 3-2 ¶¶ 9–10.)

NetApp's investments included the acquisition of an Icelandic company named Greenqloud, which "had successfully developed a cloud services orchestration and management platform." (Dkt. 1 ¶ 25.) Stefánsson was Greenqloud's Chief Executive Officer. (*Id.*) Following Greenqloud's acquisition and integration into the NetApp Group, Stefánsson joined NetApp as Vice President of Cloud Services. (*Id.* ¶¶ 4, 25; Dkt. 36-2 ¶¶ 2, 4–5.) Although Stefánsson remained an employee of Greenqloud, he was also tasked with serving "as a strong, visible executive leader across NetApp." (Dkt. 36-2 ¶ 2.1; *see* Dkt. 1 ¶ 25 (representing that Stefánsson was an employee of NetApp).)

Upon joining NetApp, Stefánsson signed two documents: an employment agreement and NetApp's Proprietary Information, Inventions, and Non-Solicitation Agreement (PIIA). (*See* Dkts. 1-2, 36-2; *see also* Dkt. 36-1 ¶¶ 4–5 (stating that Stefánsson signed these documents "[a]s part of the same acquisition transaction").

---

[1] The complaint defines a hyperscaler as "a large, cloud-based provider—such as Amazon Web Services, Google Cloud, or Microsoft Azure." (Dkt. 1 at 3 n.3 (cleaned up).)

Both agreements were signed while Stefánsson was in Iceland.  The employment agreement outlines Stefánsson's compensation and responsibilities as a NetApp executive. (Dkt. 36-2 ¶¶ 2–10.)  It also memorializes Stefánsson's agreements to use his best efforts to promote NetApp's interests, to assign NetApp any "creations, ideas, inventions, original works of authorship, developments, improvements[,] and trade secrets" conceived during his employment, and to refrain from soliciting NetApp's employees, should he leave the company.  (*Id.* ¶¶ 13, 15.2, 18.2, 19.2.)  In addition, Stefánsson's employment agreement incorporates the PIIA, "which forms an integral part of" that agreement.  (*Id.* ¶ 14.3.)  Consequently, by signing his employment agreement, Stefánsson agreed to "comply with the confidentiality provisions set forth in the [PIIA]." (*Id.* ¶ 12.)  Stefánsson's employment agreement further specifies the law to be applied in construing its terms and the venue for resolving future disputes between the parties:

> The construction, performance, interpretation[,] and validity of this [a]greement will be governed by and construed in accordance with the laws of Iceland and will be subject to the exclusive jurisdiction of the courts of Iceland.

(*Id.* ¶ 20.7.)

Under the PIIA, Stefánsson again agreed to act in NetApp's best interest, to assign the company any inventions conceived during his employment, to notify the company of any inventions that he conceived in the six months following his employment, to refrain from misappropriating NetApp's confidential and proprietary information, and to abstain from soliciting NetApp's employees and business partners.

(Dkt. 1-2 at 3, 5–6, 8–9.)  The PIIA expressly contemplates that Stefánsson "may be

subject to" an "employment agreement," and it provides that the PIIA "together with

[the] employment agreement . . . sets forth the entire agreement."  (*Id.* at 11.)  Like

Stefánsson's employment agreement, the PIIA indicates the law that is to be applied

in construing its terms and identifies the forum for resolving future disputes:

> I understand and agree that this [a]greement shall be
> interpreted and enforced in accordance with the laws of the
> state or country of the location in which I work as of the
> date of the occurrence of the breach for which enforcement
> of this [a]greement is sought, without giving effect to any
> conflicts of laws principles that require application of the
> law of a different state or country. I hereby expressly
> consent to the personal jurisdiction and venue in the state
> and federal courts of the country and county of the location
> in which I work as of the date hereof for any lawsuit filed
> there against me by [Greenqloud, NetApp, Inc., or any of
> NetApp's subsidiaries] arising from or related to this
> [a]greement.

(*Id.* at 11–12.)

Following Greenqloud's acquisition, Stefánsson continued to work in Iceland.

(Dkt. 36-2 ¶¶ 1.5, 3.2; *see* Dkt. 36-1 ¶ 6.)  Then, in January 2023, he relocated to

Orlando, Florida, in conjunction with a promotion to a senior vice president role at

NetApp.  (Dkt. 36-1 ¶ 6; *see* Dkt. 1 ¶ 5; Dkt. 66 at 3; Dkt. 81-1 ¶ 5.)  As part of

Stefánsson's relocation, the parties agreed to terminate his employment agreement.

(*See* Dkt. 36-4.)  According to Stefánsson, the move to Florida was never intended to

be permanent, as he came to the United States on a three-year visa, "never intended

to establish a permanent residence in Florida," and always remained an Icelandic

citizen.  (Dkt. 36-1 ¶¶ 2, 4–8; *see* Dkt. 81-1 ¶ 4.)

- 4 -

Stefánsson spent eight years working for NetApp. (*See* Dkt. 1 ¶ 4.) In that time, he purportedly "played a central part" in developing the company's "advanced service delivery engines for cloud data management technologies, including its cloud control plane," and "was directly involved in the development and integration of [its] first-party, cloud-native storage products with the major hyperscalers." (*Id.* ¶¶ 1, 4, 24, 33; *see* Dkt. 3-3 ¶ 5.) As a result, Stefánsson had "wide[-]ranging access to NetApp's most confidential information, proprietary innovations, intellectual property, and business relationships, including exclusive insight into [its] relationships and agreements with its hyperscaler business partners." (Dkt. 1 ¶ 4 (footnote omitted); *see* Dkt. 3-3 ¶¶ 6–9.)

Stefánsson "formally separated from NetApp on June 27, 2025." (Dkt. 1 ¶ 36.) Shortly thereafter, he incorporated a new start-up in Iceland named Red Stapler. (*Id.*; Dkt. 36-1 ¶¶ 13–14.) Two months later, NetApp's direct competitor acquired Red Stapler and hired Stefánsson to serve as its new General Manager of Cloud Solutions. (Dkt. 1 ¶¶ 10, 36, 38.) Considering the compressed timeline surrounding Stefánsson's departure from NetApp and Red Stapler's acquisition, NetApp suspects that Stefánsson must have been "innovating on behalf of another entity" while he was working for NetApp, as Red Stapler could not have developed its own technology in such a short time. (*Id.* ¶¶ 9, 13.) NetApp therefore submits that Stefánsson used Red Stapler to sell its intellectual property to a direct competitor. (*Id.* ¶¶ 1, 9.) Accordingly, NetApp now sues Stefánsson, alleging that he violated the PIIA as well as federal and state law. (*See id.* ¶¶ 44–113.)

In his motion to dismiss and the declaration attached thereto, Stefánsson denies these allegations. (*See* Dkts. 36, 36-1.) To begin, Stefánsson states that he "did not take any of NetApp's proprietary information" when he resigned his position with the company and that he has not "used, accessed, or worked on any [of NetApp's] proprietary information or intellectual property" since leaving. (Dkt. 36-1 ¶¶ 16–17, 19.) Nor is he aware, according to his declaration, of anyone else at Red Stapler having done so. (*Id.* ¶ 18.) As Stefánsson explains, NetApp's competitor "did not, directly or indirectly, acquire any software, code, product, or other intellectual property" when it acquired Red Stapler. (*Id.* ¶ 20.) Stefánsson asserts that Red Stapler did not have a product to sell, and thus the acquisition was simply a vehicle for the competitor to hire Stefánsson and his team. (*See* Dkt. 36 at 5.)

In moving to dismiss, Stefánsson contends that the court lacks personal jurisdiction over him and that the forum selection clause in his employment agreement, which is incorporated into the PIIA, requires that this dispute be litigated in Iceland. (*See id. passim.*) NetApp opposes the motion and contends not only that the court has personal jurisdiction over Stefánsson but also that the PIIA requires the parties to litigate in Florida. (*See* Dkt. 66.)

## APPLICABLE STANDARDS

"A federal district court in Florida may exercise personal jurisdiction over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is consistent with federal due process requirements." *Licciardello v. Lovelady*,

544 F.3d 1280, 1283 (11th Cir. 2008); *accord Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) ("Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."). "If both Florida law and the United States Constitution permit, the federal district court may exercise jurisdiction over the nonresident defendant." *Licciardello*, 544 F.3d at 1283.

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). "A prima facie case is established if plaintiff alleges enough facts to withstand a motion for directed verdict or judgment as a matter of law." *Schwab v. Hites*, 896 F. Supp. 2d 1124, 1130 (M.D. Fla. 2012) (citing *PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010)). "Vague and conclusory allegations do not satisfy this burden." *Catalyst Pharms., Inc. v. Fullerton*, 748 F. App'x 944, 946 (11th Cir. 2018) (citing *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006)); *see also Storms v. Haugland Energy Grp., LLC*, No. 18-cv-80334, 2018 WL 4347603, at *2 (S.D. Fla. Aug. 17, 2018) (determining that the pleading standards articulated in *Twombly* and *Iqbal* apply to motions to dismiss under Rule 12(b)(2) such that "[a]llegations that are 'no more than conclusions' . . . do not count toward establishing a *prima facie* case" of personal jurisdiction) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In determining whether a plaintiff has established a

prima facie case of personal jurisdiction, "the district court must accept the facts alleged in the complaint as true." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

Even if the plaintiff can show that the defendant is subject to the court's jurisdiction, the court may decline to hear the case under the doctrine of forum non conveniens if it appears that the interests of justice require that the case be tried in another forum. *Usme v. CMI Leisure Mgmt., Inc.*, 106 F.4th 1079, 1085 (11th Cir. 2024). The forum non conveniens analysis depends on whether a forum selection clause governs the parties' dispute. *See Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62 (2013). Absent a valid forum selection clause, courts weigh factors implicating the convenience of the parties and certain public interest considerations. *See id.* at 62–63. "[W]hen there is a valid forum[ ]selection clause, the calculus changes." *AQuate II LLC v. Myers*, 100 F.4th 1316, 1322 (11th Cir. 2024) (quoting *Atl. Marine Const. Co.*, 571 U.S. at 63). In that case, "a district court should ordinarily transfer the case to the forum specified in that clause," even if the plaintiff can show that the defendant is subject to the court's jurisdiction. *Atl. Marine Constr. Co.*, 571 U.S. at 62.

Although courts are "generally limited to reviewing what is within the four corners of the complaint on a motion to dismiss," *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006), "a court may consider matters outside the pleadings if presented in proper form by the parties," *Turner v. Costa Crociere S.P.A.*, 488 F. Supp. 3d 1240, 1245 (S.D. Fla. Sept. 9, 2020) (quotation omitted); *Gurba v. PeoplesBank*, No.

8:20-CV-2713-CEH-CPT, 2022 WL 17904395, at *4 n. 1–2 (M.D. Fla. Dec. 23, 2022) (noting that a court may consider matters outside the pleadings when a party moves to dismiss a complaint for forum non conveniens). Further, the court must "accept as true the factual allegations in the complaint to the extent they are uncontroverted by affidavits or other evidence, or have not been challenged in the context of an evidentiary hearing." *Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331, 1336 (11th Cir. 2020). The court must also "draw all reasonable inferences in favor of" the plaintiff. *Id.*

## ANALYSIS

The court first analyzes the issue of personal jurisdiction. The court then considers the forum selection clauses and determines whether to dismiss the case under the doctrine of forum non conveniens.

### A. Personal Jurisdiction

Stefánsson moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. (Dkt. 36 at 14–25.) In the complaint, NetApp asserts that Stefánsson is subject to the court's general personal jurisdiction because he is a Florida resident who "remains engaged in substantial and not isolated activity within this state" through his operation of two Florida-based companies. (Dkt. 1 ¶ 20.) NetApp also contends that Stefánsson is subject to the

court's general personal jurisdiction because he was personally served with process while voluntarily present in this state.  (Dkt. 66 at 3–5; *see* Dkt. 11, Dkt. 14.)

Under Federal Rule of Civil Procedure 4, "[s]erving a summons . . . establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located."  Fed. R. Civ. P. 4(k)(1)(A).  "As a general rule, Florida courts have personal jurisdiction over [a] nonresident[] when that nonresident is properly served with service of process while voluntarily present in the state."  *Keveloh v. Carter*, 699 So. 2d 285, 288 (Fla. Dist. Ct. App. 1997) (citing *Burnham v. Superior Court of California, County of Marin*, 495 U.S. 604, 624 (1990)); *see Xena Invs., Ltd. v. Magnum Fund Mgmt. Ltd.*, 726 F.3d 1278, 1284 (11th Cir. 2013) (finding error where a district court dismissed a complaint for lack of personal jurisdiction because the plaintiff had established personal jurisdiction over a foreign national, who was not a resident of Florida, under Florida's transient jurisdiction rule); *Clear Skies Nevada, LLC v. Reece*, No. 615CV1987ORL31TBS, 2016 WL 11577842, at *1 (M.D. Fla. Apr. 15, 2016) (determining that the court had jurisdiction over a nonresident defendant who was served while physically present in this state (citing *Burnham*, 495 U.S. at 619)); *SPM Thermo-Shield, Inc. v. SICC*, No. 2:15-CV-439-FTM-29CM, 2015 WL 7076692, at *2 (M.D. Fla. Nov. 13, 2015) (concluding that the court had personal jurisdiction over a foreign national, who was not a resident of Florida, because he was served while physically present in this state (citing *Burnham*, 495 U.S. at 619)); *Alobaid v. Khan*, 306 So. 3d 159, 162–63 (Fla. Dist. Ct. App. 2020) (concluding that the court had personal jurisdiction over a foreign national who was

personally served with process while "voluntarily present in Florida"); *Durkee v. Durkee*, 906 So. 2d 1176, 1177 (Fla. Dist. Ct. App. 2005) (affirming the denial of a nonresident's motion to dismiss for lack of personal jurisdiction because he was "served [with process] while . . . living and working in Florida"); *see also Wolfson v. Wolfson*, 455 So. 2d 577, 578 (Fla. Dist. Ct. App. 1984) ("Still alive and well is the traditional principle that proper service on a person found within the territory of the state effects in personam jurisdiction when the person is present voluntarily, not because of fraud or trick, and not to appear in court on an unrelated matter."); *Risman v. Whittaker*, 326 So. 2d 213, 214 (Fla. Dist. Ct. App. 1976) (observing that tag jurisdiction predates Florida's long-arm statute, which gave plaintiffs "a new and additional jurisdictional possibility").

This general rule derives from one of "the most firmly established principles of personal jurisdiction in American tradition," as the United States Supreme Court explained in *Burnham*. *See* 495 U.S. at 610. In that case, a married couple who had been living in New Jersey separated. *Id.* at 607–08. The wife then moved to California, where she filed for divorce. *Id.* When the husband traveled there to visit their children, the wife served him with a summons and a copy of the divorce petition. *Id.* at 608. The husband challenged the California court's jurisdiction, arguing that he lacked sufficient minimum contacts with the state. *See id.* The California courts disagreed, concluding that the husband was subject to personal jurisdiction in their courts because he was personally served with process while he was physically present

in the state. *Id.* On appeal, the United States Supreme Court unanimously agreed that the husband was subject to personal jurisdiction in California. *See id.* at 619, 628. In reaching this decision, the Supreme Court explained that a court may exercise tag, or transient, personal jurisdiction over a nonresident defendant who is served with process while physically present in the forum state and that such jurisdiction satisfies due process. *Id.* at 619.

Like the husband in *Burnham*, Stefánsson was served with process, several motions, and this court's order granting NetApp's request for a temporary restraining order while physically present in this state. (*See* Dkt. 66 at 3–5; *see* Dkt. 11, Dkt. 14.) Notably, Stefánsson does not contend that he was lured to this state under false pretenses, *Wolfson*, 455 So. 2d at 578, or that his presence was required by another court, *Keveloh*, 699 So. 2d at 288. Instead, Stefánsson acknowledges that he voluntarily returned to Florida to pack his belongings, prepare his home for sale, and otherwise wind up his affairs before returning to Iceland. (Dkt. 37-1 ¶ 12.) As Stefánsson was served with process while voluntarily present in this state, this court's exercise of personal jurisdiction meets due process. *See Burnham*, 495 U.S. at 610, 619, 628.

Still, Stefánsson argues that the court lacks jurisdiction as "Florida courts have found that tag jurisdiction is constitutionally suspect" following the United States Supreme Court's decision in *Daimler AG*. (Dkt. 81 at 1 (citing *Daimler AG,* 571 U.S. 117).) Stefánsson does not explain how the Court's decision in *Daimler AG*, which did not consider the constitutionality of tag jurisdiction, casts doubt on the viability of that

form of jurisdiction.  *See Daimler AG*, 571 U.S. at 133–42.  (*See* Dkts. 36, 81.) Stefánsson further fails to identify any decision from Florida suggesting that the Florida Supreme Court would find tag jurisdiction constitutionally suspect.  (*See* Dkts. 36, 81.)  The cursory nature of Stefánsson's analysis on this point is fatal to his argument, as a party abandons issues that it raises in passing, asserts perfunctorily, buries within its brief, or uses merely to support other arguments.  *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–82 (11th Cir. 2014).

Finally, Stefánsson suggests that the court lacks jurisdiction because the complaint does not allege tag jurisdiction as a basis for this court's personal jurisdiction.  (Dkt. 81 at 2.)  This argument misses the mark, as the court could allow NetApp to amend the complaint to allege a theory of tag jurisdiction.  (*See* Dkt. 105 at 28, 45.)  *See Advantage Trim & Lumber Co., Inc. v. Royal Bank of Can.*, No. 8:17-CV-523-T-26AAS, 2017 WL 2930804, at *3 (M.D. Fla. July 10, 2017); *see also Rae v. Celebrity Cruises, Inc.*, No. 1:21-CV-21668, 2022 WL 2981868, at *2 (S.D. Fla. July 28, 2022) (considering a theory of jurisdiction that the plaintiff did not specifically allege in the complaint).  In any case, when jurisdiction turns on the defendant having been personally served while present in this state, "[t]he return of service is the instrument a court relies on to determine whether jurisdiction over an individual has been established."  *Koster v. Sullivan*, 160 So. 3d 385, 388 (Fla. 2015); *accord Murphy v. Cach, LLC*, 230 So. 3d 599, 600 (Fla. Dist. Ct. App. 2017) ("the return of service is the instrument a court relies on to determine whether jurisdiction over an individual has

been established."); *see Friedman v. Schiano*, 777 F. App'x 324, 330 (11th Cir. 2019) (explaining that a plaintiff may bring a defendant within the jurisdiction of Florida's federal courts by serving them with process in accordance with state law, and that a plaintiff may satisfy its initial burden to prove jurisdiction by producing a return of service that is regular on its face); *Trisura Specialty Ins. Co. v. Off the Traxx, LLC*, No. 6:23-CV-454-PGB-LHP, 2024 WL 4593362, at *2 (M.D. Fla. Sept. 12, 2024) (explaining that a return of service that is valid on its face will satisfy the plaintiff's initial burden to establish the court's jurisdiction); *Tom v. Mod. Concepts Constr. LLC*, No. 6:22-CV-1644-PGB-DAB, 2022 WL 18774819, at *2 (M.D. Fla. Nov. 21, 2022) ("A plaintiff can meet his burden to prove proper service of process by showing that the return of service is 'facially valid or regular on its face.'" (quoting *Koster*, 160 So. 3d at 388)); *Weinstock v. Harvey*, No. 8:19-CV-2979-T-33AEP, 2020 WL 13133417, at *1 (M.D. Fla. Jan. 29, 2020) (noting that a valid return of service is sufficient to meet a plaintiff's burden to satisfy their burden to show the court's jurisdiction); *see also Alobaid*, 306 So. 3d at 162 ("[Defendant] was personally served with process while voluntarily present in Florida, which was sufficient to confer personal jurisdiction over him."). "If the return is regular on its face, then the service of process is presumed to be valid[,] and the party challenging service has the burden of overcoming that presumption by clear and convincing evidence." *Koster*, 160 So. 3d at 389; *Tom*, 2022 WL 18774819, at *2 ("The party challenging service has the burden of overcoming th[e] presumption [that service was valid] by clear and convincing evidence."); *Alvarez v. Gregory HVAC LLC*, No. 8:19-CV-1826-CEH-JSS, 2021 WL 3857560, at *3 (M.D.

- 14 -

Fla. Aug. 30, 2021) ("[A] return of service is evidence of whether service was validly effected."). Stefánsson does not contest that he was personally served with process while in this state, nor does he present evidence to suggest that NetApp's attempts at service were invalid. (*See* Dkt. 36; Dkt. 81.) Accordingly, the court has personal jurisdiction over Stefánsson.

### B. The Forum Selection Clauses

Next, Stefánsson moves to dismiss this case citing the forum selection clause in his employment agreement. (*See* Dkt. 36 at 5–15.) He contends that the provision applies to NetApp's claims under the PIIA because the two documents "constitute a single, integrated agreement," and must therefore be read together. (*Id.* at 9.) NetApp disagrees. (*See* Dkt. 66 at 10–18.) NetApp asserts that the forum selection clause in Stefánsson's employment agreement is inapplicable to this dispute, as it has sued Stefánsson solely under the PIIA, which has its own choice of law and forum selection provisions. (*See id.* at 11.)

"In this federal question case, federal law determines the enforceability of the forum selection clauses." *Don't Look Media, LLC v. Fly Victor, Ltd.*, 999 F.3d 1284, 1297 (11th Cir. 2021). "Under federal common law, forum selection clauses are to be interpreted by reference to ordinary contract principles." *Cornett v. Carrithers*, 465 F. App'x 841, 842 (11th Cir. 2012) (quotation omitted)); *accord P & S Bus. Machs, Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003) ("The validity of a forum selection clause is determined under the usual rules governing the enforcement of contracts.").

Still, "the guiding legal principles are the same under federal and [Florida] law." *Conax Fla. Corp. v. Astrium, LTD*, 499 F. Supp. 2d 1287, 1297 n.9 (M.D. Fla. July 18, 2007); *see Defs of Wildlife v. Salazar*, 877 F. Supp. 2d 1271, 1292 (M.D. Fla. July 10, 2012) (observing that the principles of contract interpretation applied under Florida law and federal law are virtually the same); *Parker v. Great Lakes Dredge & Dock Corp.*, No. 8:07-CV-163-T-33TGW, 2008 WL 4534130, at *4 n.5 (M.D. Fla. Oct. 7, 2008) (noting that Florida law and federal law concerning contract interpretation and construction "are substantially similar," as both have adopted the general rules of contract interpretation and construction).

The primary goal of contract interpretation is to determine the parties' intent at the time of contracting. *See Sweet Additions Ingredient Processors, LLC v. Meelunie Am., Inc.*, 139 F.4th 1217, 1228 (11th Cir. 2025) ("Ultimately, we enforce the intent of the parties at the time of contracting, as embodied in the written instrument." (quotation omitted)); *accord Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So. 3d 955, 958 (Fla. Dist. Ct. App. 2015) ("The intent of the parties governs contract interpretation."). As the contract is the best evidence of the parties' intent, "their intent is to be determined from the plain language of the agreement and the everyday meaning of the words used." *Burlington & Rockenbach, P.A.*, 160 So. 3d at 958; *accord Slater v. Energy Servs. Grp. Int'l*, 634 F.3d 1326, 1330 (11th Cir. 2011) (explaining that "the plain meaning of a contract's language governs its interpretation"). Thus, "[w]here a contract is clear and unambiguous, it must be enforced pursuant to its plain

language." *Hahamovitch v. Hahamovitch*, 174 So. 3d 983, 986 (Fla. 2015) (quotation omitted).

As mentioned, each agreement contains its own choice of law and forum selection clauses.  (*See* Dkt. 1-2 at 11–12; Dkt. 36-2 ¶ 20.7.)   Ordinary contract principles require that the court read Stefánsson's employment agreement and the PIIA together, as "[t]he law is well established that two or more documents executed by the same parties, at or near the same time, and concerning the same transaction or subject matter are generally construed together as a single contract."  *Rios v. Quiala*, 279 So. 3d 1244, 1246 (Fla. Dist. Ct. App. 2019); *see Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1339 (11th Cir. 2015) (reading a series of agreements, each concerning a distinct part of a construction project, together, as one agreement because they formed a single transaction); *Clayton v. Howard Johnson Franchise Sys., Inc.*, 954 F.2d 645, 649 (11th Cir. 1992) (construing two documents together as a single agreement because they "were executed on the same date between the same parties, and dealt with the operation of related businesses" and also "contain[ed] numerous cross-references and other evidence that they [were] functionally intertwined, indicating that the parties contemplated that the two documents would be considered together").  Construing documents together does not mean that every provision in one document necessarily becomes a part of the other. *Lawrence v. United States*, 378 F.2d 452, 461 (5th Cir. 1967).  Instead, the provisions within each agreement are "simply to be read and construed together in order to arrive at the true intention of the parties."  *Id.*   In construing the agreements together, the

court should harmonize the various provisions in each agreement, giving effect to each when reasonably possible. *Rishell. v. Comput. Scis. Corp.*, 647 F. App'x 226, 229 (4th Cir. 2016) (citing *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000)); *Hulse v. Orthodontic Educ., Ltd*, No. 3:05-CV-594-J-32TEM, 2011 WL 32437, at *3 (M.D. Fla. Jan. 5, 2011) ("A provision of a contract is to be construed in connection with the other provisions, so that if possible, or so far as is possible, they all may harmonize."). Ultimately, "a reasonable interpretation of a contract is preferred to an unreasonable one." *See Critchlow v. Williamson*, 450 So. 2d 1153, 1156 (Fla. Dist. Ct. App. 1984).

In this case, Stefánsson and Greenqloud signed the employment agreement and the PIIA together "[a]s part of the same acquisition transaction." (Dkt. 36-1 ¶¶ 4–5; *see* Dkt. 1-2 at 12; Dkt. 36-2 at 14; *see also* Dkt. 66 at 15–16.) The documents address the same subject matter: Stefánsson's employment with the NetApp Group. (*See* Dkts. 1-2, 36-2; *see also* Dkt. 66 at 16.) Further, they contain corresponding covenants, as Stefánsson promised to protect NetApp's intellectual property, to assign the company any "creations, ideas, inventions, original works of authorship, developments, improvements[,] and trade secrets" that he conceived during his employment, and to refrain from soliciting its employees by signing each agreement. (*Compare* Dkt. 1-2 at 3–6, 8–9 *with* Dkt. 36-2 ¶¶ 13, 18.2, 18.7.) In addition, each document expresses the parties' intent that the documents be read together. For instance, the employment agreement states that it is "contingent upon [Stefánsson] satisfactorily completing, agreeing to, signing, and otherwise fulfilling" the PIIA, "which forms an integral part of" that agreement. (Dkt. 36-2 ¶¶ 14.3, 19.2.) Likewise, the PIIA acknowledges that

it is "a material part of the consideration for [Stefánsson's] employment" and that its purpose is to "confirm[] certain terms of [his] employment" with the NetApp Group. (Dkt. 1-2 at 2, 11.) Each agreement expressly states that it is complete only when read alongside the other. For example, the PIIA states that "*[t]his [a]greement (together with any employment agreement . . .)* sets forth the entire agreement and understanding between [Greenqloud] and [Stefánsson] relating to the subject matter herein and merges all prior discussions between us." (Dkt. 1-2 at 11 (emphasis added).) Similarly, Stefánsson's employment agreement states that "*[t]his [a]greement, including the PIIA*, constitutes the entire contract between the [p]arties regarding the employment of [Stefánsson] by [Greenqloud]." (Dkt. 36-2 ¶ 20.1 (emphasis added).) The PIIA expressly states that it does not supersede "any covenants entered into in connection with the Greenqloud acquisition, even those that appear similar." (Dkt. 1-2 at 2; *see* Dkt. 36-2 ¶ 20.1 (stating the parties' intent that the terms of Stefánsson's employment agreement and any amendments thereto "will prevail in the event of any conflicts between [that agreement's] terms and any provisions contained in the NetApp policies, internal rules, guidelines, or regulations.").)

Despite the substantial overlap of Stefánsson's employment agreement and the PIIA, (*compare* Dkt. 1-2 at 3–6, 8–9 *with* Dkt. 36-2 ¶¶ 18, 18.2, 18.7), NetApp contends that they are separate agreements that were never meant to be read together, (*see* Dkt. 66 at 13–18). NetApp's interpretation is not supported by the greater weight of the evidence concerning the parties' intent at the time they entered into the agreements at

issue. *See Sweet Additions Ingredient Processors, LLC*, 139 F.4th at 1228 (noting that courts enforce the parties' intent "at the time of contracting"). Under NetApp's reasoning, it could have avoided "the exclusive jurisdiction of the courts of Iceland" from the start simply by suing Stefánsson under the PIIA and not his employment agreement, (*see* Dkt. 66 at 13–18), although misappropriating NetApp's trade secrets and soliciting its employees would have also violated the terms of Stefánsson's employment agreement, (*compare* Dkt. 1-2 at 3–6, 8–9 *with* Dkt. 36-2 ¶¶ 13, 18). A more reasonable interpretation is that the parties intended for the mandatory forum selection clause in Stefánsson's employment agreement to govern Stefánsson's performance under both agreements. *Critchlow*, 450 So. 2d at 1156 ("a reasonable interpretation of a contract is preferred to an unreasonable one."); *see Don't Look Media LLC*, 999 F.3d at 1299 (observing that a forum selection clause will extend so far as its terms allow). Stefánsson's employment agreement and the PIIA must be read together, as they not only were "executed by the same parties, at or near the same time," with respect to "the same transaction," *Rios*, 279 So. 3d at 1246, but also sufficiently express the parties' intent to be bound by both agreements. To interpret the documents otherwise would be to fail to give effect to the parties' entire agreement. *See Grovehurst Homeowners Ass'n, Inc. v. Stone Crest Master Ass'n, Inc.*, 365 So. 3d 1282, 1285 (Fla. Dist. Ct. App. 2023); *see also Rios*, 279 So. 3d at 1246.

Stefánsson contends that the forum selection clause in his employment agreement is mandatory and, when read together with the PIIA, vests exclusive jurisdiction for this dispute in Iceland. (*See* Dkt. 36 at 7–15.) Forum selection clauses

are "categorized as either permissive or mandatory." *Ocwen Orlando Holdings Corp. v. Harvard Prop. Tr., LLC*, 526 F.3d 1379, 1381 (11th Cir. 2008). "A permissive clause authorizes jurisdiction in a designated forum but does not prohibit litigation elsewhere, whereas a mandatory clause dictates an exclusive forum for litigation under the contract." *Slater*, 634 F.3d at 1330 (alterations adopted and quotation omitted). "A forum selection clause is mandatory if it uses words such as must, exclusive, or shall." *Gold Crown Resort Mktg. Inc. v. Phillpotts*, 272 So. 3d 789, 793 (Fla. Dist. Ct. App. 2019) (quotation omitted); *see Don't Look Media, LLC*, 999 F.3d at 1297 (determining that a forum selection clause stating that "[t]he courts of England shall have exclusive jurisdiction to adjudicate any dispute" arising out of the parties' agreement was mandatory, as it required that all disputes falling within its ambit be litigated in that country); *Travel Exp. Inv. Inc. v. AT & T Corp.*, 14 So. 3d 1224, 1227 (Fla. Dist. Ct. App. 2009) (concluding that a forum selection clause, stating that "the parties consent to the exclusive jurisdiction of the courts located in New York City, USA," was a mandatory forum selection clause, as it required a particular forum). "Absent words of exclusivity, a forum selection clause will be deemed permissive." *Michaluk v. Credorax (USA), Inc.*, 164 So. 3d 719, 722 (Fla. Dist. Ct. App. 2015); *see S&S Directional Boring & Cable Contrs., Inc. v. Am. Nat'l Bank of Minn.*, 961 So. 2d 1046, 1047 (Fla. Dist. Ct. App. 2007) ("[C]lauses that merely consent to jurisdiction and venue in the named forum and do not exclude jurisdiction or venue in any other forum are permissive."). This distinction is significant, as the Eleventh Circuit enforces "only those clauses that unambiguously designate the forum in which the parties must enforce their rights

under the contract." *Florida Polk County. v. Prison Health Servs., Inc.*, 170 F.3d 1081, 1083 n. 8 (11th Cir. 1999); *see Cableview Commc'ns of Jack., Inc. v. Time Warner Cable Se. LLC*, No. 3:13-CV-306-J-34JRK, 2014 WL 1268584, at *23 (M.D. Fla. Mar. 27, 2014) ("When a forum[ ]selection clause is permissive rather than mandatory, the [c]ourt considers it only as one of several factors weighing in favor or against transfer.").

The forum selection clause in Stefánsson's employment agreement states that its "construction, performance, interpretation[,] and validity . . . will be governed by and construed in accordance with the laws of Iceland and *will be subject to the exclusive jurisdiction of the courts of Iceland*." (Dkt. 36-2 ¶ 20.7 (emphasis added).) Because this clause designates an exclusive forum for the parties to litigate certain disputes, it is a mandatory forum selection clause. *Gold Crown Resort Mktg. Inc.*, 272 So. 3d at 793. Regarding the forum selection clause in the PIIA, Stefánsson "expressly consent[ed] to the personal jurisdiction and venue in the state and federal courts of the country and county of the location in which [he] work[ed] as of the date hereof for any lawsuit . . . arising from or related to th[e] [a]greement." (Dkt. 1-2 at 12.) Unlike the forum selection clause in Stefánsson's employment agreement, this clause is permissive, as it merely acknowledges Stefánsson's consent to jurisdiction in a particular forum, without excluding jurisdiction or venue elsewhere. *S&S Directional Boring & Cable Contrs., Inc.*, 961 So. 2d at 1047.

NetApp points to the two clauses as evidence that the parties did not intend to create a single contract. (Dkt. 66 at 13–14.) Yet the mere fact that the forum selection clauses can be read to conflict does not necessarily mean that they are incompatible.

*See Dodge City, Inc. v. Byrne*, 693 So. 2d 1033, 1035 (Fla. Dist. Ct. App. 1997) (finding error where the trial court elected not to interpret several documents together as a single agreement because they included conflicting provisions). Instead, to the extent that Stefánsson's employment agreement and the PIIA appear to conflict, the court must attempt to construe them in a complementary manner. *Id.* When the court cannot, the solution is to "adopt a reasonable interpretation," *Dune I v. Palms N. Owners Ass'n*, 605 So. 2d 903, 905 (Fla. Dist. Ct. App. 1992), or to construe the ambiguities against NetApp, as the party that drafted the agreements, *Daake v. Decks N Such Marine, Inc.*, 201 So. 3d 179, 181 (Fla. Dist. Ct. App. 2016); *Deroy v. Carnival Corp.*, 963 F.3d 1302, 1315 (11th Cir. 2020) ("Where contract principles do not reveal a particular meaning of a clause in question and more than one reasonable construction is plausible, we choose the construction that favors the non-drafting party."). Courts that have considered contracts with more than one forum selection clause have either read the provisions in a complementary manner, so they point to the same forum, *see Summa Humma Enters., LLC v. Fisher Eng'g*, No. 12-CV-367-LM, 2013 WL 57042, at *3 (D.N.H. Jan. 3, 2013) (construing two documents together as a single contract and rejecting an interpretation in which a permissive forum selection clause within one document displaced the mandatory forum selection clause in the other, in favor of an interpretation in which each clause complemented the other and directed the parties to the same forum), or have concluded that the mandatory provision controls, *see Muzumdar v. Wellness Int'l Network, Ltd.*, 438 F.3d 759, 762 (7th Cir. 2006) (concluding that a mandatory forum selection clause within a contract, which incorporated another

document that contained its own permissive forum selection clause, governed both documents, as the permissive forum selection clause could not "undermine a very strongly worded forum selection clause containing mandatory language"); *Kan. City S. Ry. Co. v. Hanover Ins. Co.*, 159 F. Supp. 3d 729, 737 (S.D. Miss. 2015) (finding that a mandatory forum selection clause in one agreement, which was incorporated into a second agreement, governed both agreements and did not conflict with the permissive forum selection clause in the second agreement (collecting cases); *Regalia, LLC v. Bankfirst*, No. 09-20780-CIV, 2009 WL 10656843, at *5 (S.D. Fla. May 8, 2009) (reading several documents together to form a single agreement and concluding that the mandatory forum selection clause in one document governed both documents and did not conflict with the permissive consent to jurisdiction clause in the other document, even though they pointed to different forums).   Because the Eleventh Circuit considers mandatory forum selection clauses to be "presumptively valid and enforceable," *Slater*, 634 F.3d at 1331, and does not defer to permissive forum selection clauses, *Prison Health Servs., Inc.*, 170 F.3d at 1083 n. 8, the permissive forum selection clause within the PIIA cannot undermine the strongly worded, mandatory forum selection clause within Stefánsson's employment agreement, *see Muzumdar*, 438 F.3d at 762.

In any case, the provisions are consistent, as they point to the same forum. Whereas the forum selection clause in Stefánsson's employment agreement requires that suit be brought in Iceland, the forum selection clause in the PIIA is permissive, allowing, but not requiring, suit to be filed in "the location in which [Stefánsson]

work[ed] as of the date hereof." (*Compare* Dkt. 36-2 ¶ 20.7 *with* Dkt. 1-2 at 12.)  The meaning of the PIIA's forum selection clause turns on the meaning of "the date hereof," which Stefánsson argues refers to the date that he signed the agreements.  (*See* Dkt. 36 at 8 n.2; Dkt. 36-2 ¶ 3.2 ("[Stefánsson] will continue to perform work in [Greenqloud]'s offices [in] . . . Reykjavik."); *see also* Dkt. 36-1 ¶¶ 5–6 (declaring that Stefánsson did not relocate to the United States until 2022); Dkt. 36-4 (confirming Stefánsson's transfer to the United States at the end of December 2022).)  NetApp does not adopt Stefánsson's plain reading of the text but instead argues that the clause should be read to mirror the choice of law provision that immediately precedes it.  (*See* Dkt. 105 at 34.)  Accordingly, NetApp argues that "the location in which [Stefánsson] work[s] as of the date hereof" should be read to mean "the location in which [Stefánsson] work[s] as of the date of the occurrence of [any purported] breach for which enforcement of th[e] [a]greement is sought."  (*See id.*)

Stefánsson's interpretation aligns with a plain meaning of the text, as "hereof" means "[o]f this thing (such as a provision or document); relating or belonging to this document."  *Hereof*, Black's Law Dictionary (12th ed. 2024); *accord Hereof*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/hereof (defining "hereof" to mean "of this") (last visited Jan. 27, 2026); *see Parrish v. State Farm Fla. Ins. Co.*, 356 So. 3d 771, 776 (Fla. 2023) ("Dictionaries aid us in establishing the publicly understood plain meaning of a word whose relevant definition is contested, and we look to them when a contractual term is undefined within a contract."); *see also RCJV Holdings, Inc. v. Collado Ryerson, S.A. de C.V.*, 18 F. Supp. 3d

534, 543 (S.D.N.Y. 2014) ("The word hereof when used in a document patently refers to the document in which the term is used.").  NetApp's interpretation of the provision would make more sense had the agreement stated that it would be "interpreted and enforced in accordance with the laws of the state or country of the location in which [Stefánsson] work[ed] as of the date of the occurrence of the breach for which enforcement of this [a]greement is sought . . . [and that Stefánsson] expressly consent[ed] to the personal jurisdiction and venue in the state and federal courts of the country and county of the location in which [he] work[ed] as *of the date [thereof]* for any lawsuit filed there," (Dkt. 1-2 at 12 (emphasis added), as the term "thereof" means "[o]f that, it, or them," *Thereof*, Black's Law Dictionary (12th ed. 2024); *accord Thereof*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/thereof (defining "thereof" to mean "of that or it" and "from that cause or particular") (last visited Jan. 27, 2026).  The dichotomy between "hereof" and "thereof" is important because the two words communicate a difference in immediacy; "hereof" implies a direct, present connection, whereas "thereof" indicates more separation.  When Stefánsson signed the PIIA, there was a direct and present connection between the agreement and the date it was signed, while it was unclear whether Stefánsson would ever commit a breach.

More to the point, NetApp's interpretation of the provision forgets that "the use of different language in different contractual provisions strongly implies that a different meaning was intended." *See Aleman v. Gervas*, 314 So. 3d 350, 352 (Fla. Dist. Ct. App. 2020).  Here, the parties used different language to identify the forum for litigating

and the law that would govern. (*See* Dkt. 1-2 at 11–12.) NetApp's interpretation of the PIIA's forum selection clause would also render it meaningless, as the forum selection clause would simply fold into the choice of law clause—a result discouraged by the rules of construction. *People's Tr. Ins. Co. v. Lamolli*, 352 So. 3d 890, 895 (Fla. Dist. Ct. App. 2022) ("Rules of construction require that no word or part of an agreement is to be treated as a redundancy or surplusage if any meaning, reasonable and consistent with other parts, can be given to it." (alterations adopted and quotation omitted)). Finally, NetApp's interpretation of the PIIA's forum selection clause places it in direct conflict with the mandatory forum selection clause in Stefánsson's employment agreement, another result discouraged by the rules of construction. *See Dodge City, Inc.*, 693 So. 2d at 1035. A plain reading of the forum selection clauses within Stefánsson's employment agreement and the PIIA suggests that Iceland is the proper forum for this dispute.

Applying the mandatory forum selection clause in Stefánsson's employment agreement to the PIIA is also reasonable because each agreement sufficiently expresses the parties' intent to incorporate the other by reference. "[W]here a writing expressly refers to and sufficiently describes another document, the other document, or so much of it as is referred to, is to be interpreted as part of the writing." *Pier 1 Cruise Experts v. Revelex Corp.*, 929 F.3d 1334, 1340–41 (11th Cir. 2019) (quoting *Quix Snaxx v. Sorensen*, 710 So. 2d 152, 153 (Fla. Dist. Ct. App. 2019) (alterations adopted and internal quotation marks omitted)). "The requirement that the contract language be explicit or otherwise clear and precise for incorporation does not amount to a rule that the parties

must use a rote phrase or some other magic words in order to effect an incorporation by reference." *PartyLite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d 1213, 1231 (M.D. Fla. 2012) (quotation omitted). "Rather, it is sufficient if the general language of the incorporation clause reveals an intent to be bound by the terms of the collateral document." *Id.*; *see Architectural Ingenieria Siglo XXI, LLC*, 788 F.3d at 1335–36, 40 (concluding that several addenda to a contract "clearly and unambiguously incorporated the [contract's] terms" when they stated that "[a]ll other remaining [a]rticles of [the contract] that have not been modified remain in full effect, the same as the [d]ocuments of the [c]ontract that are not modified by . . . the present [a]ddendum"). As discussed, Stefánsson's employment agreement and the PIIA state that they form two parts of the same whole. (*See* Dkt. 1-2 at 11 (expressing that the PIIA "together with any employment agreement . . . sets forth the entire agreement"); Dkt. 36-2 ¶ 20.1 (stating that Stefánsson's employment agreement, "including the PIIA, constitutes the entire contract between the [p]arties").) Further, each agreement acknowledges the parties' intent to be bound by the other, as part of the same transaction. (Dkt. 1-2 at 2, 11 (acknowledging that the PIIA is "a material part of the consideration for [Stefánsson's] employment," and "confirms certain terms of [his] employment"); Dkt. 36-2 ¶¶ 14.3, 19.2 (indicating that Stefánsson's employment was contingent upon his agreeing to and signing the PIIA, "which form[ed] an integral part of" his employment agreement).) This language reveals the parties' intent to be bound by both agreements and goes sufficiently beyond the "mere reference to another

document" with which Florida courts have taken issue.  *See Harvey as Tr. of Russel A. Schlegel Revocable Living Tr. v. Lifespace Cmtys., Inc.*, 306 So. 3d 1248, 1251 (Fla. Dist. Ct. App. 2020).

The decision in *Lallouz v. D.E.T. Card, L.C.*, 724 So. 2d 157, 158 (Fla. Dist. Ct. App. 1998), illustrates when a forum selection clause within one agreement that is referenced in a second agreement will bind the parties for claims arising under the second agreement.  In *Lallouz*, the defendant guaranteed two contracts, each containing a forum selection clause that vested exclusive jurisdiction in the federal and state courts located in Dade County, Florida.  *Id.*  The borrower later sued the defendant in Dade County, alleging that he violated the guarantees.  *See id.*  The defendant moved to dismiss for forum non conveniens, asserting that the forum selection clauses in the underlying contracts were inapplicable to the parties' dispute regarding the guarantees.  *See id.*  The trial court denied the motion, and the appellate court affirmed, finding that the forum selection clauses in the underlying contracts applied to the guarantees because the guarantees were made pursuant to the contracts' terms.  *Id.* (emphasis omitted).  In reaching this decision, the appellate court concluded that the guarantees sufficiently referred to and described the underlying contracts, thereby incorporating the forum selection clauses.  *See id.*; *Mgmt. Comput. Controls, Inc. v. Charles Perry Constr., Inc.*, 743 So. 2d 627 (Fla. Dist. Ct. App. 1999) (determining that the mandatory forum selection clause within a licensing agreement that was incorporated into the parties' contract governed the plaintiff's breach of contract claims, as the contract sufficiently expressed the parties' intent to be bound by both

agreements).  Because Stefánsson's employment agreement and the PIIA sufficiently express the parties' intent to be bound by both agreements, the mandatory forum selection clause in Stefánsson's employment agreement governs his performance under both agreements.

The subsequent termination of Stefánsson's employment agreement, (*see* Dkt. 36-4), does not change this result.  "Absent express language in an agreement to the contrary, forum selection clauses are not extinguished by termination."  *Fla. PACE v. Pinellas County*, 385 So. 3d 631, 638 (Fla. Dist. Ct. App. 2024); *accord Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 857 (11th Cir. 2016) ("While contractual obligations may expire upon the termination of a contract, provisions that are structural (e.g., relating to remedies and the resolution of disputes) may survive that termination.").  "That is because[,] unlike the substantive rights and obligations in a contract, a forum[ ]selection clause is a structural provision that addresses the procedural requirements for dispute resolution."  *Fla. PACE Funding Agency*, 385 So. 3d at 638 (alterations adopted and quotation omitted).  As a result, "[a] forum selection clause does not require a 'savings clause' to survive termination."  *Id.* at 639.  Here, the letter terminating Stefánsson's employment did not expressly extinguish the forum selection clause in Stefánsson's employment agreement.  (*See* Dkt. 36-4.)  Further, the parties agree that the clause survived the agreement's termination.  (*See* Dkt. 36 at 10; Dkt. 105 at 34–35 ("I do agree [that the forum selection clause] survives the [termination of the] Icelandic agreement and would govern any suit on the Icelandic agreement related to Icelandic employment.").  The parties simply dispute the clause's

application to the matter at hand. (*See* Dkt. 36 at 5–15; Dkt. 66 at 14–15.) Yet, as set forth above, the agreements must be read together so that the mandatory forum selection clause in Stefánsson's employment agreement governs his obligations under both agreements. *See Muzumdar*, 438 F.3d at 762; *Lallouz*, 724 So. 2d at 158. (*See* Dkt. 1-2 at 2, 11; Dkt. 36-2 ¶¶ 14.3, 19.2, 20.1.)

Having determined that the mandatory forum selection clause within Stefánsson's employment agreement survived that agreement's termination, the court "must next decide whether the clause[] cover[s] the disputes at issue." *See Baker v. Econ. Rsch. Servs., Inc.*, 242 So. 3d 450, 454 (Fla. Dist. Ct. App. 2018). To determine whether a forum selection clause encompasses a particular claim, a court looks to the language of the clause, *Stiles v. Bankers Healthcare Grp., Inc.*, 637 F. App'x 556, 559 (11th Cir. 2016); *accord Bah. Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1340 (11th Cir. 2012), with the understanding that forum selection clauses "are broadly construed to effectuate an orderly and efficient resolution of all claims arising between the parties to a contract and to promote enforcement of those clauses consistent with the parties' intent," *Pods, Inc. v. Paysource, Inc.*, No. 8:05-CV-1764-T-27EAJ, 2006 WL 1382099, at *2 (M.D. Fla. May 19, 2006) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070 (11th Cir. 1987)).

As discussed, claims concerning the "construction, performance, interpretation[,] and validity" of the parties' agreement are "subject to the exclusive jurisdiction of the courts of Iceland." (Dkt. 36-2 ¶ 20.7.) Stefánsson focuses on the word "performance," arguing that the parties' mandatory forum selection clause

"plainly applies to this dispute" because each of NetApp's claims concerns his performance under the PIIA. (*See* Dkt. 36 at 8, 10.) "Performance" generally means the "successful completion of a contractual duty" or the fulfillment of a promise. *See Performance*, Black's Law Dictionary (12th ed. 2024); *Performance*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/performance (defining performance to mean "the execution of an action" and the "fulfillment of a claim, promise, or request.") (last visited Jan. 27, 2026); *see also Duty*, Black's Law Dictionary (12th ed. 2024) ("A legal obligation that is owed or due to another and that needs to be satisfied; that which one is bound to do, and for which somebody else has a corresponding right.").

The court in *Gold Crown Resort Marketing Inc.*, considered a forum selection clause like the one in Stefánsson's employment agreement. 272 So. 3d at 789. In that case, the plaintiffs sued a marketing company in Florida, alleging the company violated their membership agreements. *Id.* at 791. In addition to bringing a breach of contract claim, the plaintiffs also asserted several tort claims. *See id.* The plaintiff's contracts contained a forum selection clause, which stated that "[t]he construction, validity[,] and performance of this agreement will be governed by the laws of [California] and will be subjected to the exclusive jurisdiction of the applicable courts." *Id.* at 791, 93. Citing the forum selection clause, the defendant moved to dismiss, arguing that the dispute belonged in California. *Id.* at 791–72. The trial court denied the motion. *Id.* at 791. On appeal, the appellate court concluded that the clauses were mandatory as they identified an "exclusive jurisdiction" and that they encompassed

each of the plaintiff's claims, as each arose from the defendant's alleged non-performance under the agreements. *Id.* at 793 n.7; *see Farmers Grp., Inc. v. Madio & Co.*, 869 So. 2d 581, 582 (Fla. Dist. Ct. App. 2004) (concluding that statutory and tort claims may fall within the scope of a forum selection clause where they have "their origin and genesis in the [a]greement").

Here, NetApp's claims each relate to Stefánsson's alleged non-performance under the PIIA, as they emanate from Stefánsson's contractual obligations under the agreement. (*See* Dkt. 1 ¶¶ 44–113.) To start, the breach of contract counts relate to Stefánsson's performance under the PIIA, as they allege that he failed to perform several contractual obligations under the agreement. (*See id.* ¶¶ 44–63.) So do the statutory counts. (*See id.* ¶¶ 64–113.) "When determining whether an agreement's forum[ ]selection clause applies to non-contractual claims, courts have considered whether there is a 'significant and obvious nexus' between the claims and the agreement." *Baker*, 242 So. 3d at 455 (quoting *Farmers Grp., Inc.*, 869 So.2d at 582). Such a nexus exists between a claim and a contract "if the claim presents circumstances in which the resolution of the disputed issue requires either reference to, or construction of, a portion of the contract." *Baker*, 242 So. 3d at 455 (quoting *Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 593 (Fla. 2013)). "More specifically, a claim has a nexus to a contract and arises from the terms of the contract if it emanates from an inimitable duty created by the parties' unique contractual relationship." *Baker*, 242 So. 3d at 455 (quoting *Jackson*, 108 So. 3d at 593); *Am. Spirit & Cheer Essentials, Inc. v. Varsity Brands, LLC*, No. 1:20-CV-03088-SCJ, 2020 WL 8115878, at *9 (N.D. Ga.

- 33 -

Oct. 27, 2020) ("The Eleventh Circuit enforces forum selection clauses and interprets them liberally to include non-contractual claims if the facts giving rise to the claims developed from the parties' business relationship." (collecting cases)).  According to NetApp, Stefánsson had access to NetApp's trade secrets and proprietary information only because he promised to "maintain the secrecy of the information [and] limit its use" when he signed the PIIA.  (Dkt. 1 ¶¶ 66–69, 77–80, 92–95, 102–105; *see* Dkt. 1-2 at 3 (promising to "keep in confidence and trust and [] not . . . use or disclose" NetApp's proprietary information or anything relating to it); *see also* Dkt. 36-2 ¶¶ 12 14.3, 20.1.)  In signing that agreement, Stefánsson also promised not to work for any businesses that might conflict with NetApp during his employment and to promptly disclose and assign to NetApp any inventions that he "conceived, reduced to practice, created, derived, developed, or made . . . during the term of [his] employment" or in the six months that followed.  (Dkt. 1-2 at 5–6, 8; *see* Dkt. 36-2 ¶¶ 2.3, 14.1, 14.3, 18.2, 20.1.)  Purportedly, despite these promises, Stefánsson began working for Red Stapler while he was employed by NetApp and used his access to the company's proprietary information and trade secrets to develop a competing product, which Red Stapler then sold to NetApp's direct competitor.  (*See* Dkt. 1 ¶¶ 6–7, 32–33, 66–72, 77–83, 92–98, 102–107.)  Because each count in NetApp's complaint concerns Stefánsson's performance of his contractual obligations, each cause of action falls within the scope of the mandatory forum selection clause.

Mandatory forum selection clauses "are presumptively valid and enforceable" unless the plaintiff "makes a strong showing that enforcement would be unfair or

unreasonable under the circumstances." *Slater*, 634 F.3d at 1331 (quotation omitted); *accord Liles v. Ginn-La W. End, Inc.*, 631 F.3d 1242, 1245 (11th Cir. 2011) (noting that forum selection and choice of law clauses "are presumptively valid where the underlying transaction is fundamentally international in character." (quoting *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1295 (11th Cir. 1998)). To make such a showing, a plaintiff must demonstrate that (1) "the clause was induced by fraud or overreaching," (2) the plaintiff "would be deprived of its day in court because of inconvenience or unfairness," (3) "the chosen law would deprive [it] of a remedy," or (4) "enforcement of the clause would contravene public policy." *Turner v. Costa Crociere S.p.A.*, 9 F.4th 1341, 1345 (11th Cir. 2021) (quotation omitted). At bottom, a plaintiff who seeks to avoid enforcement of a valid forum selection clause bears "a heavy burden of proof," *Slater*, 634 F.3d at 1346, and "the practical result is that forum[ ]selection clauses should control except in unusual cases," *Atl. Marine Const. Co.*, 571 U.S. at 64.

NetApp has not met its heavy burden. Because it does not believe that Stefánsson's employment agreement and the PIIA should be read together, NetApp presumes that the mandatory forum selection clause does not apply to this dispute. (*See* Dkt. 66 at 11–20.) As a result, NetApp neither addresses any of the factors that courts consider when determining whether to enforce a valid forum selection clause nor shows that enforcing the one at issue here would be unfair or unreasonable. (*See id.*) *Turner*, 9 F.4th at 1345; *Slater*, 634 F.3d at 1331. Still, the court has examined

NetApp's arguments to determine whether any can be made to fit within the *Turner* framework. *See* 9 F.4th at 1345. It appears that NetApp believes it will be deprived of its day in court and ultimately denied a remedy if the court enforces the forum selection clause. (*See* Dkt. 66 at 21.)

To invalidate a forum selection clause on the grounds that its enforcement would deprive a party of its day in court, a plaintiff must "show that litigating in the contractual forum will be so gravely difficult and inconvenient that [the plaintiff] will for all practical purposes be deprived of [its] day in court." *Rucker v. Oasis Legal Fin., L.L.C.*, 632 F.3d 1231, 1236–37 (11th Cir. 2011). Here, NetApp cites its Icelandic law expert, Hjördís Halldórsdóttir, for the proposition that it cannot sue Stefánsson in Iceland, as those courts "ha[ve] no authority over [his] actions while employed by the U.S. entity." (Dkt. 66 at 21 (citing Dkt. 66-3 ¶ 15).) This proposition misstates Halldórsdóttir's opinion. (*See* Dkt. 66-3 ¶ 15.) Although Halldórsdóttir believes that Stefánsson's employment agreement and the PIIA should not be read together and that the latter agreement alone governed Stefánsson's conduct while he worked in the United States, (*see id.* ¶¶ 7–15), Halldórsdóttir does not contend that Icelandic courts lack jurisdiction over Stefánsson or this dispute, (*see id. passim*). That distinction matters for two reasons. First, Stefansson does not argue that the performance-related obligations in his employment agreement govern this dispute, (*see* Dkt. 36 at 4), and second, NetApp has repeatedly stated that it is suing Stefánsson under the PIIA, (*see* Dkt. 66 at 2, 4, 10–18, 21). Simply put, Halldórsdóttir's opinions do not support the proposition that Icelandic courts "ha[ve] no authority over" Stefánsson's actions or

that enforcing the parties' forum selection clause would deprive NetApp of its day in court. (*See* Dkt. 66 at 21; Dkt. 66-3.) Ultimately, NetApp has not shown that litigating in Iceland would be so gravely difficult and inconvenient that it will "for all practical purposes be deprived of [its] day in court." *Rucker*, 632 F.3d at 1236–37 (rejecting the suggestion that a forum selection clause should be disregarded because the chosen forum would deprive a plaintiff of a remedy, as the contract also included a choice of law provision that would govern the dispute). Turning to NetApp's other argument, the court may invalidate the forum selection clause if NetApp demonstrates that "the remedies available in the chosen forum are so inadequate that enforcement would be fundamentally unfair." *See Lipcon*, 148 F.3d at 1297. Here, the employment agreement and the PIIA each contain choice of law provisions that will govern this dispute, wherever it is litigated. (*See* Dkt. 1-2 at 11–12; Dkt. 36-2 ¶ 20.7.) Accordingly, this factor does not militate against enforcing the forum selection clause either. *See Rucker*, 632 F.3d at 1237. In any case, NetApp does not appear to be concerned that it cannot obtain a remedy in Iceland, only that it cannot obtain a preliminary injunction or seek equally expansive discovery in that country. (*See* Dkt. 66 at 21; Dkt. 66-3 ¶¶ 20–26.) These concerns are unpersuasive, as a lack of discovery or an absence of "beneficial litigation procedures similar to those available in the federal district courts" will not render a foreign forum inadequate. *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001). Here, the parties' experts agree that "Icelandic courts are competent to hear breach-of-contract and trade secret claims," like those alleged in the complaint, and that Icelandic courts can provide NetApp a remedy

- 37 -

should it prove its allegations.  (Dkt. 66-3 ¶ 19; *see* Dkt. 36-9 ¶¶ 1.6, 1.8, 2.14.)  That is what matters.  *See Satz*, 244 F.3d at 1283.  Accordingly, NetApp has not made "a strong showing" that enforcement of the parties' mandatory forum selection clause would be unfair or unreasonable.  *See Slater*, 634 F.3d at 1331.

### C. Forum Non Conveniens

Under the doctrine of forum non conveniens, a district court has the inherent power to decline to exercise jurisdiction even where venue is proper.  *Usme*, 106 F.4th at 1085.  NetApp submits that Stefánsson's motion should be denied, as he has not carried his heavy burden to "overcome the strong presumption" in favor of NetApp's chosen forum.  (*See* Dkt. 66 at 18–19.)  NetApp also contends that the private factors that courts generally consider, such as access to evidence and witnesses, also favor this forum.  (*See id.* at 19–20.)  As mentioned, the court analyzes motions to dismiss for forum non conveniens differently depending on whether a forum selection clause governs the parties' dispute.  *See Atl. Marine Constr. Co.*, 571 U.S. at 62.  For instance, where, as here, there is a valid forum selection clause, "the plaintiff's choice of forum merits no weight."  *Id.* at 63.  "Rather, as the party defying the forum[ ]selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted."  *Id.*  Further, "a court evaluating a defendant's . . . motion to transfer based on a forum[ ]selection clause should not consider arguments about the parties' private interests," as those factors are deemed "to weigh entirely in favor of the preselected forum."  *Id.* at 64.  Accordingly, the court

limits its consideration to the public interest factors, which "may include the administrative difficulties flowing from court congestion[,] the local interest in having localized controversies decided at home[,] and the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 62 n.6 (alterations adopted and quotation omitted). These factors "will rarely defeat a transfer motion," as "[i]n all but the most unusual cases, . . . the interest of justice is served by holding parties to their bargain." *Id.* at 62, 66 (internal quotation marks omitted).

Here, NetApp maintains that two public-interest factors favor this forum. (*See* Dkt. 66 at 20.) To begin, NetApp suggests that there is a local interest in deciding this case in Florida because the state has "an interest in ensuring [that] businesses operating [in this state] have the protection" of federal and state law. (*Id.* citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947).) However, NetApp has not shown that a dispute between a corporation that is a citizen of Delaware and California and an individual who is a citizen of Iceland, concerning the latter's performance under an agreement containing a foreign forum selection clause, is a truly localized controversy that should be decided in this district. (*See* Dkt. 66 at 20; *see also* Dkt. 1 ¶ 15; Dkt. 1-2 at 12; Dkt. 36-1 ¶¶ 2, 4–8; Dkt. 36-2 ¶ 20.7.) NetApp also contends that this case should be decided in this district because it has filed suit under federal and state law and is therefore entitled to litigate this case in "a forum in its own country[,] to ensure the protection of its trade secrets." (Dkt. 66 at 20.) While there is "a strong federal interest in making sure that plaintiffs who are United States citizens generally get to choose an American forum for bringing suit," *Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1311

(11th Cir. 2002), simply filing suit under federal and state law is not sufficient to defeat an otherwise valid forum selection clause.  *See Don't Look*, 999 F.3d at 1299 (enforcing a foreign forum-selection clause despite the plaintiff's argument that it should not have to litigate "a complex [federal statutory] fraud and money laundering matter before a foreign court"); *Lipcon*, 148 F.3d at 1295 (holding that the anti-waiver provisions in the federal securities statutes did not prevent the court from enforcing the parties' choice of law and forum selection provisions, which vested exclusive jurisdiction in England and required the application of that country's law); *see also Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 952 (11th Cir. 1997) (concluding that "a plaintiff's inability to assert a [particular federal statutory] claim in the foreign forum does not preclude forum non conveniens dismissal").  NetApp has not shown that this is the exceptional case in which the public interest factors overwhelmingly disfavor enforcing the parties' forum selection clause.  *See Atl. Marine Constr. Co.*, 571 U.S. at 62, 66; *Sapuppo*, 739 F.3d at 681–82.

Defendant Jon Thorgrimur Stefánsson's Motion to Dismiss (Dkt. 36) is **GRANTED**.  The Clerk is **DIRECTED** to enter judgment accordingly, to terminate any pending motions and deadlines, and to close this case.

**ORDERED** in Orlando, Florida, on January 30, 2026.

_____
JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record